# REPORTS OF CASES

DECIDED IN

# THE COURT OF APPEALS

OF THE

## DISTRICT OF COLUMBIA.

---

## ROSS

*v.*

## THE UNITED STATES ex rel. GOODFELLOW.

---

MANDAMUS ; SUBDIVISIONS, PLATS OF ; APPEALS.

1. While the Commissioners of this District may be compelled by *mandamus* to take cognizance of, consider and pass judgment upon plats of subdivisions submitted to them, the judgment itself cannot be dictated or coerced ; *following* Kerr *v.* Ross, 5 App. D. C. 241.

2. Under the act of Congress of August 27, 1888 (25 Stat., 451), relating to sub-divisions in this District, the Commissioners have the discretion to make reasonable deflections in the avenues in their extension to the boundaries of the District, and the power after designating the lines of extension to refuse admission to the record of a plat of a subdivision which did not conform therewith until it should be so made to conform.

3. The act of 1888 is not repealed by the act of March 2, 1892 (27 Stat., 532), known as the "Highway Extension Act," but after the map provided for by the latter act shall have been finally adopted, all power to make subdivisions under the act of 1888 will cease.

4. An application for the allowance of an appeal to the Supreme Court of the United States from a judgment of this court reversing a judgment of the lower court and dismissing a petition for a writ of *mandamus* to compel the District Commissioners to receive and admit to record a plat of a subdivision of certain lands, *denied.*

No. 476.  Submitted June 6, 1895.  Decided June 17, 1895.

HEARING on an appeal by the Commissioners of the District of Columbia from a judgment directing the issuance of a writ of *mandamus* to compel them to receive and admit to record the plat of a subdivision of certain lands. *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. S. T. Thomas*, Attorney for the District of Columbia; *Mr. A. B. Duvall*, Assistant Attorney, and *Mr. A. S. Worthington* for the appellants.

*Messrs. Fulton & Edwards* and *Mr. George E. Hamilton* for the appellees.

Mr. Justice SHEPARD delivered the opinion of the Court:

This is an appeal by John W. Ross, George Truesdell and Charles F. Powell, Commissioners of the District of Columbia, from a judgment commanding them to receive and admit to record a plat of a subdivision made by appellees of certain land in the District of Columbia.

The appellees, Eleanor B. Goodfellow, May M. Chase, Eliza, Robert R., Alexander, Theodore, Lee B. and James Mosher, and Imogen M. Wilson, are the owners of a tract of land called " Youngsborough," situated in the northeastern part of the District and outside of the limits of the city of Washington. In March, 1895, they subdivided this tract into squares and lots, with streets and alleys " conforming," as they allege, " with exactness to the established general plan of streets in the city of Washington." Blocks 1 and 2 of the general subdivision had been mapped and recorded previously, and the present plat added thereto blocks 3 to 13, inclusive. The plat as offered for approval and record was duly certified by the surveyor of the District and all formalities had been complied with.

The subdivision was under the act of August 27, 1888, which reads as follows (see 25 Stat. 451):

" *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the Commissioners of the District of Columbia be, and they are hereby, authorized and directed to make and publish such general orders as may be necessary to regulate the platting and subdividing of all lands and grounds in the District of Columbia; and no such plat of subdivision made in pursuance of such orders shall be admitted to record in the office of the surveyor of said District without an order to that effect endorsed thereon by the Commissioners of said District.

" Sec. 2. That all spaces on any duly recorded plat of land thereon designated as streets, avenues or alleys shall thereupon become public ways, provided they are made in conformity with the provisions of section one of this act, and as such be under the protection of the laws and ordinances in force applicable to public roads out of said city.

" Sec. 3. That if by the extension of any of the present streets or avenues, or the opening of any public way, it becomes necessary to traverse any grounds now used as a cemetery, or place of burial, the Commissioners are hereby empowered to secure a right of way through the same by stipulation with the proprietors thereof.

" Sec. 4. That the orders of the Commissioners made pursuant to this act shall have the force and effect of law thirty days subsequent to the day of publication; and all laws and provisions of laws inconsistent herewith are hereby repealed.

" Sec. 5. No future subdivision of land in the District of Columbia, without the limits of the cities of Washington and Georgetown, shall be recorded in the surveyor's office of the said District unless made in conformity with the general plan of the city of Washington."

In attempted compliance with this act, the Commissioners, on December 6, 1888, adopted certain rules and regulations, which are still in force; among them are the following :

" 7. No subdivision of land outside the cities of Washington and Georgetown will be approved unless the streets and avenues therein conform as far as practicable in width and general direction to the same streets and avenues in the city of Washington.

" 8. Whenever practicable, streets and avenues will be in exact alignment with the streets and avenues of the city of Washington and of equal width.

" 9. Streets not in alignment with the streets of Washington shall be not less than ninety feet in width, and shall be distant from each other not less than 300 nor more than 600 feet.

" 11. The existing avenues of the city of Washington shall be extended, as nearly as practicable, in continuation of their direction within the city, and of equal width, and all subdivisions must provide therefor.

" 12. Existing avenues may be deflected beyond the city limits wherever the Commissioners deem advisable.

" 13. Besides existing avenues and their extensions, other avenues will be provided for in all subdivisions wherever the Commissioners may deem it necessary to make the subdivision conform to the general plan of the city of Washington."

The next act of Congress on this subject is entitled "An act to provide a permanent system of highways in that part of the District of Columbia lying outside of cities," approved March 2, 1893 (27 Stat. 532).

This act directs the Commissioners to prepare a plan " for the extension of a permanent system of highways " over all the District outside of Washington and Georgetown, which " system shall be made as nearly in conformity with the street plan of the city of Washington as the Commissioners may deem advisable and practicable." The said plans are to be prepared in sections, covering, first, such areas as are covered by existing subdivisions not in conformity with the general plan of the city of Washington.

The Commissioners are required to adopt and conform

to any then existing subdivisions, which shall have been made in compliance with the act of 1888, or which shall, in the opinion of the Commissioners, conform to the general plan of the city of Washington. Whenever the plan of a section shall have been adopted, a map thereof shall be made, and the Commissioners may lay out at intersections of principal avenues and streets, circles or other reservations corresponding in number and dimensions with those now existing at such intersections within the city. A copy of the map shall then be submitted to a board consisting of the Secretaries of War and Interior and the Chief of Engineers, who may make such alterations as they may deem advisable, " keeping in view the intention and provisions of this act, and the necessity of harmonizing as far as possible the public convenience with economy of expenditure ; and if such commission shall see fit, they may cause to be made a new map in place of the one submitted to them ; " and the map which they may approve or adopt shall be delivered to the Commissioners and at once filed and recorded. It is further provided that, " *after* any such map shall have been so recorded no *further* subdivision of any land included therein shall be admitted to record in the office of the surveyor of said District or in the office of the recorder of deeds thereof unless the same be first approved by the Commissioners and be in conformity to such map." It is further provided that any owner of land included in the map may adopt the subdivision thereby made by reference in deed or will, which shall have the same effect as if he had made the subdivision himself and recorded it in compliance with law.

Congress has, from time to time, in the general appropriation acts, appropriated money for surveys to enable the Commissioners to determine whether plats of subdivisions offered for record have been made in conformity with the act of 1888, and $2,500 were appropriated therefor in the act of March 2, 1895. At the same time money was appropriated to carry out the act of 1893, and this provision

was added thereto : "And the Commissioners are author-
ized to make such minor and essential changes in existing
subdivisions made in compliance with the provisions of the
act approved August 27, 1888, as they may deem advisable
and practicable, for the purpose of connecting subdivisions
and *for a better conformity to the general plan of the city of
Washington.*"

In their answer to the rule the Commissioners say that
when the plat was submitted to them they objected to it on
the ground that " no provision was made therein for the
extension of Delaware avenue, the alignment of which, as
previously determined under the law by these respondents,
fell partly within the limits of the proposed subdivision."
After reciting the various acts and rules made by the Com-
missioners, which have been stated above, the answer pro-
ceeded to assert that before the said plat was submitted to
them the Commissioners had surveys made and maps
drawn, covering the section including appellee's land, and
had determined that the extension of Delaware avenue as
proposed conforms to the general plan of Washington,
" and that it is as nearly in conformity to the street plan of
Washington as these respondents deem advisable or practi-
cable in view of the location of the Metropolitan branch of
the Baltimore and Ohio Railroad and for other reasons ;
and, further, that, having determined upon a street plan for
the territory including and adjacent to the tract of land in
question, these respondents are advised that by direction of
and in compliance with law it is their bounden duty not to
approve nor permit to be recorded any plat of a subdivision
which is contrary to such street plan. These respondents
further say that for good and sufficient reasons the exten-
sion of Delaware avenue on its present lines is impracti-
cable, and that if it were practicable it is inadvisable, and
that in locating the extension of Delaware avenue they have
acted in good faith."

It is conceded that if Delaware avenue were extended in
a straight line from the boundary of the city it would not

cross, or even touch, the land of appellees.   The first sug-
gestion of the Commissioners would have carried this ave-
nue through the appellees' land, about the centre.   As now
proposed it runs along its side and takes from the tract
about one-half the area of the avenue, which is estimated
to be near three acres.   The learned justice who heard the
case below was of the opinion that the plat offered by ap-
pellees was in conformity to the general plan of the city as
provided in the act of 1888, and that the Commissioners
had no right to deflect Delaware avenue and to require
appellees to lay it out across their land as a condition pre-
cedent to the admission of the plat to record; and that as
they had no discretion in the premises, after the admission
that the plat was, in other respects, in conformity with the
general plan of the city, the *mandamus* ought to issue to
compel the ministerial act of admission to record.

Before the passage of the act of 1888, there was no law
requiring or permitting the record of plats of subdivisions of
land lying outside of the cities of Washington and George-
town.   The act of 1809 (R. S. D. C., sec. 477) applied
only to the subdivisions of squares and lots, as designated on
the map of the city, and had no relation to outlying lands.
A practice seems, however, to have grown up, after that act,
of admitting to record in the surveyor's office plats of sub-
divisions of outlying lands, and many such were actually
recorded before 1888.   Some of these were made without
regard to the general plan of the city, and have, since
building up, occasioned more or less inconvenience for that
reason.   It is generally agreed that the purpose of the act
of 1888 was to prevent the inconvenience resulting from the
foregoing practice, by extending the general plan of the city
throughout the District.   The first section of that act gives
very general powers to the Commissioners to make rules
and regulations to govern the making of new subdivisions,
which, after thirty days' publication, were to " have the
force and effect of law."   The fifth and last section limits
those powers, which otherwise would have been absolute,

by providing that no subdivision shall be recorded " unless made in conformity with the general plan of the city." We do not concur in the view that this section means that there shall be, under any and all circumstances, an exact prolongation, on straight lines, of all the streets and avenues of the city as they come to the boundary. It is reasonable to presume that Congress had some knowledge of the adjacent country, and some conception of the fact that it might be wholly impracticable to make a rigid extension on the exact alignment of existing streets and avenues. It must be remembered, too, that while the regular streets run in straight lines, north and south, and east and west, the avenues were at many points deflected. There were circles, squares and reservations, generally at the intersection of avenues, but not always, and the courses of avenues were often changed at such points. Pennsylvania avenue is a notable instance, and Virginia and Massachusetts avenues also furnish examples. In one sense, too, it may be said that those very reservations constitute a part of the general plan of the city. All these things may have been in the minds of Congress when it was declared that there should be conformity to the general plan. Had it been intended that the conformity should be complete and exact in all respects, to the extent of prolonging all streets and avenues from the boundary in the same direct course, it would seem that the declaration to that effect ought to have been express and explicit. Unquestionably it was intended that the streets of the new subdivisions should follow, in a general way, the plan of the streets of the city, as regards general course, width and distances apart, and it became the duty of the Commissioners to see that this was observed with all reasonable care and exactness. The opinions of the Commissioners with respect to the duties and powers defined in the act are shown in the rules and regulations for executing the law, made and published immediately after its passage. In these it was declared, as we have seen, that the streets and avenues must " conform as

far as practicable in width and general direction to the same streets and avenues in the city of Washington ;" that whenever practicable they should be in " exact alignment " with the said streets and avenues ; that existing avenues shall be extended as nearly as practicable in continuation of their direction within the city, and may be deflected beyond the city limits whenever deemed advisable ; and other avenues may be laid off whenever deemed necessary to make the subdivisions conform to the general plan of the city.

It is certainly true that the construction given by public officers to the powers conferred on them by law is not to control the interpretation thereof by the courts ; but still when acted upon in apparent good faith and published for the information and guidance of the public and of private persons directly interested, as is this case, it is entitled to consideration and to some weight at the least. Regulations were required to be made and published, and were declared to have effect as laws. The making of the rules, and their contents, would appear to be known to Congress, which, from year to year, made appropriations to give effect to them and secure their execution. No objection seems ever to have been raised by any one prior to this controversy. Five years later, the act of March 2, 1893, expressly conferred the powers contained in these rules, and greater, upon the Commissioners in the execution of the plan of subdivision provided for therein. Following this, the clause in the general appropriation bill of March 2, 1895, evidently contemplated that the subdivisions, made under the act of 1888, were not all in exact conformity, at all points, with the general plan of the city, because it conferred the additional power to correct all such as had been made and recorded by making " minor and essential changes " as deemed advisable and practicable for " *the purpose of correcting subdivisions and for a better conformity to the general plan* of the city of Washington."

Now, had the Commissioners refused simply to admit the plat to record because, in their opinion, not in conform-

ity with the general plan of the city, we are clearly of the opinion that their action would be beyond the control of the courts. The act of 1888 charges them with the duty of ascertaining a fact and requires them to pass judgment upon it; and no matter how erroneous such judgment might be, the courts would have no power to revise it, because no jurisdiction to review the decisions of the Commissioners, in such cases, has been conferred upon the courts. They may be compelled to take cognizance of, to consider, to pass judgment upon, plats of subdivisions submitted to them, but the judgement itself cannot be dictated or coerced. *United States ex rel. Kerr* v. *Ross*, 5 App. D. C. 241; *Com. of Patents* v. *Whitely*, 4 Wall. 522, 533.

It becomes necessary now to consider, whether the Commissioners, in deciding that the plat was in conformity with the general plan of the city, in the alignment, width, etc., of streets, exhausted their discretion in the premises ; and whether the sole ground of their refusal to admit to record, viz : unless the appellees would lay out Delaware avenue, as directed, was a condition which they had the lawful right to impose? If the contention of the appellees be sound, there remained nothing to be performed by the Commissioners save the merely ministerial duty of admitting to record, which could be compelled by mandamus, under well established exceptions to the general rule. *Butterworth* v. *Hoe*, 112 U. S. 50, 68 ; *United States* v. *Schurz*, 102 U. S. 378, 402, 403.

Though possible hardship and pecuniary loss may be inflicted upon some private land owners through this act of 1888, especially as construed by the Commissioners in the rules promulgated thereunder, still it must be remembered that each owner has the undoubted right to lay off his land in any manner that he pleases, or not to subdivide it at all. He cannot be made to dedicate streets and avenues to the public. If public necessity demands parts of his land for highways, it can be taken only by condemnation and pay-

ment of its value.    But he has no corresponding right to have his plat of subdivision so made admitted to the records.

In providing for public record Congress can accompany the privilege with conditions and limitations applicable alike to all persons.    In providing for such record in the act of 1888, Congress sought to subserve the public interest and convenience by requiring practical conformity in all subdivisions of land into squares, streets and avenues, with the general plan of the city as originally established, and this, regardless of the fact that it might, in instances, practically coerce the dedication of streets to public use which would otherwise have to be paid for.

As heretofore indicated, we are of the opinion that it was the purpose of the act of 1888 to repose some discretion in the Commissioners with respect to the location of the extensions of the avenues whenever called upon to admit a plat to record.    That this discretion might sometimes even be unjustly and oppressively exercised, was a matter for Congress alone to consider.

Ultimate power must reside somewhere, and injustice and oppression even cannot always be avoided in its exercise. We do not mean to intimate that there has been anything unjust or intentionally oppressive in the action of the Commissioners in this case.    There is nothing to indicate that they have not been governed solely by what they conceive to be their duty under the law, as well as a desire, in good faith, to execute the will of Congress as they understand it.    It is with the existence of their power and discretion that we have concern, and not with the manner of its exercise. Without reference to any other law than that of 1888, we think the Commissioners had the discretion, when rendered important and necessary by the topography, to make some reasonable deflections in the avenues in their extension to the boundaries of the District.    Hence they had the power, after designating the lines of extension, to refuse admission to the record of a plat of a subdivision which did not conform therewith.

Both parties rely to some extent upon the act of 1893, and its construction in connection with that of 1888, to sustain their several contentions, and its effect must be considered before arriving at a final conclusion.   That act, as we have seen, has for its purpose the making of a plan for the location of streets and avenues throughout the entire District outside the city limits.   It is elaborate in its details, and confers, by express grant, very great discretion upon the Commissioners in the first instance.

They are to make their system " as nearly in conformity" with the general plan of the city as they " may deem advisable and practicable."   In addition, they are authorized to lay off, at the intersections of principal avenues and streets, circles or other reservations corresponding in number and dimensions with those now existing at such intersections in the city of Washington.   Evidently to avoid injury to private owners and to avoid expense, they are directed to adopt and conform to the *then* existing subdivisions made in compliance with the act of 1888.   Then the supervising board are empowered to make such changes in the plans submitted by the Commissioners as they "shall deem advisable, *keeping in view the intention and provisions of this act and the necessity of harmonizing as far as possible the public convenience with economy of expenditure.*"

The clause in the appropriation act of March 2, 1895, broadens still further the powers of the Commissioners.

The act of 1893 cannot be held to repeal the act of 1888, nor to impair its powers by substitution except as hereinafter indicated.   On the contrary, until its purpose shall have been accomplished, it would rather seem to recognize, not only the continued force of the act, but also the validity of the rules of the Commissioners made in pursuance thereof, and to supplement and extend its object.   Under the first act, subdivisions could only be made by the owners of the land; under the second, the designation of streets and avenues over all the lands of the District is made obligatory upon the Commissioners, subject to the power of

review lodged in the supervising board. But until the plan of a section, including the particular land, shall have been made and finally adopted, subdivisions may go on under the act of 1888 and be admitted to record if approved by the Commissioners. When so made, approved and recorded, they must be conformed with in making the new plans and maps, and difficulties arising in connecting one with another are provided for in the act of 1895, above quoted.

After the map, provided for by the act of 1893, shall have been finally adopted, all power to make subdivisions under the act of 1888 must necessarily cease. After that time private owners may adopt the new map by reference thereto in deed or will. They may, in conformity with said map and with the approval of the Commissioners, make such further subdivisions of lands covered thereby as they may desire; but this privilege extends only to the subdivision of spaces within the lines of the designated and established streets and avenues, and does not extend to any alterations in, or encroachments upon, their lines. The final adoption by the supervising board places them beyond the powers of either the owners or the Commissioners, unless possibly for the purpose of connecting subdivisions, etc., as provided in the act of 1895.

We are not unmindful of the great hardships that may be inflicted upon appellees and other land owners who may be similarly situated, by operation of the several laws referred to. If compelled to follow the dictation of the Commissioners as to the location of Delaware avenue, in order to secure the record of their plat, the appellees will be compelled to dedicate to the public use nearly three acres of their land for an avenue which they may have had no reasonable ground to expect would ever be deflected at the city boundary so as to cross their land. But this is not all. If they should accept the situation and thus dedicate the avenue to the public use, the supervising board may hereafter, for good reasons, again change the line of the extension. In such event they will have donated a part of their

land to the public (for such is the effect of the act of 1888), without necessity, for the recovery of which they might be left to look to an act of Congress in the future. If, in the meantime, they shall have sold lots with reference to the existence of said avenue, they could not recall the dedication, under any circumstances, without the consent of their grantees. Then, again, if relieved by Congress and unembarrassed by sales, they might be compelled to lay off the lands anew and change the plat materially in order to recover the abandoned avenue.

The practical effect of these laws must, almost necessarily, be to suspend all subdivisions and sales until such times as the necessary section maps shall be made and finally adopted. It is to be regretted, therefore, that Congress did not expressly suspend the record of plats of subdivisions under the act of 1888, and require the maps of the District to be made within a fixed time, no longer off than absolutely necessary, so as to work as little hardship as possible. As it is, no time has been provided for the completion of the work. More than two years have elapsed since the approval of the act (March 2, 1893), and but two sections have been surveyed and mapped, neither of which has yet been finally adopted. If Congress should neglect in the future to regularly provide the money to carry the work to completion, there may be indefinite delay. Holding, as we are constrained to do, that the Commissioners have been vested with discretionary powers in the matter of approval of plats of subdivisions offered for record, it is beyond our power to inquire into and correct any error into which they may have fallen, if, indeed, they may have fallen into one at all. The possible hardships, enumerated in part above, are inherent in the laws governing the whole subject-matter, and are equally beyond our power to correct or prevent.

In accordance with the views here expressed, we must *reverse the judgment, with costs to the appellants, and dismiss the petition of the relators. And it is so ordered.* .

On June 20, 1895, *Messrs. Fulton & Edwards*, and *Mr. Hamilton*, on behalf of the appellees, filed motions for a rehearing and for an appeal to the Supreme Court of the United States.

On October 9, 1895, the motions were overruled, Mr. Chief Justice ALVEY delivering the opinion of the Court :

We have considered the motion for rehearing of this case, and the reasons assigned therefor ; but we do not discover any sufficient ground for granting the motion.   And as to the alternative prayer for an appeal, while we are never disposed to thwart or embarrass the exercise of the right of appeal, yet we think we ought not to allow an appeal unless sanctioned by law.   In this case, there is no sufficient evidence that the matter in dispute, exclusive of costs, exceeds the sum of $5,000—the value of the land not being the subject of dispute—nor is this a case, without regard to the sum or value in dispute, in which is drawn in question the validity of a treaty or statute of or an authority exercised under the United States—conditions necessary to exist to entitle the party applying to writ of error to the Supreme Court of the United States.   27 Stat. 434 ; *South Carolina v. Seymour*, 153 U. S. 353, 357, 358.

This conclusion and ruling of ours, however, will in no manner hinder or prevent the party desiring the appeal or writ of error from applying to one of the justices of the Supreme Court of the United States for the allowance of an appeal or writ of error, and which will be granted, if, in his judgment, it ought to be allowed.

We must refuse both motions ; *and it is so ordered.*

                                        *Motions denied.*