[L. A. No. 20673. In Bank. June 14, 1949.]

DONALD B. AYRES, Appellant, v. THE CITY COUNCIL
OF THE CITY OF LOS ANGELES, Respondent.

Howlett & Elson, Musick, Burrell & Ingebretsen and Eugene M. Elson for Appellant.

Ray L. Chesebro, City Attorney, Bourke Jones, Assistant City Attorney, and Lester L. Lev, Deputy City Attorney, for Respondent.

SHENK, J.—This appeal is by the petitioner from a judgment denying relief in a mandamus proceeding brought to compel the respondent city council to approve a proposed subdivision map without certain imposed conditions.

A tentative map for the subdivision of 13 acres owned by the petitioner in what is commonly known as the Westchester District in the city of Los Angeles was submitted in October,

1944, to the city planning commission pursuant to the Subdivision Map Act (Stats. 1937, p. 1874, as amended, now Bus. & Prof. Code, § 11500 et seq.). The planning commission attached four conditions to which the petitioner objected, whereupon he appealed to the city council. The matter was noticed for a hearing before that body, after which an order was made sustaining each of the conditions. The petitioner thereupon commenced the present proceeding in the superior court. Because of the inclusion in the petition of allegations tendering the issue of lack of a full hearing, the court in overruling the demurrer to the petition also ordered that the trial of other factual issues proceed on presentation and consideration of all material and relevant evidence. The trial consumed two weeks in the course of which the trial judge viewed the locality of the proposed subdivision. Findings were made and judgment entered upholding the lawfulness and reasonableness of the imposed conditions. The appeal involves the sufficiency of the evidence to support the findings and judgment.

The area known as Westchester District of which the proposed 13-acre subdivision forms a part consists of 3,023 acres. It is bisected in a northerly and southerly direction by Sepulveda Boulevard, and easterly and westerly by Manchester Boulevard. It extends 1 mile to the south of Manchester and a mile and a half to the north; and 1 mile on either side of Sepulveda. Before subdivision the land in the district was owned by Los Angeles Extension Company, Security-First National Bank of Los Angeles, and Superior Oil Company. The petitioner represented the latter as subdivider and selling agent. In 1940, the formation of a general plan of development of the district was commenced. The plan fixed the business area on Sepulveda Boulevard immediately south of Manchester Boulevard and the petitioner was placed in charge of development by the subdividers. The so-called cellular design of residence lot subdivision was employed so that the rear of residential lots abuts the principal thoroughfares, thus prohibiting access to the lots therefrom. Another purpose of this type of subdivision was to minimize the amount of land required for street purposes. This general plan had been followed in the Westchester district. Requirements insuring uniformity were imposed, among which were the dedication of a 10-foot strip in the residence areas and a 13-foot

strip on each side in the business section for the widening of Sepulveda Boulevard, and the setting aside of a strip for planting purposes varying in width at the rear of lots in the residence sections bordering the principal thoroughfares.

The petitioner's 13-acre tract, the last of the subdivisions in the district, is a long narrow triangle. Its northerly boundary is less than 500 feet in length, and the southerly point of the triangle about 2,400 feet from the northerly line. Arizona Avenue runs along the westerly line. Sepulveda Boulevard, the principal thoroughfare and heavily trafficked artery, borders the easterly line. These highways converge and form the southerly point of the triangle. Sepulveda Boulevard, from a point a short distance north of the convergence to the north line of the tract, is 100 feet wide but south of that point is 110 feet wide. Seventy-seventh Street enters Arizona Avenue from the west approximately opposite the center of the tract, and the proposed subdivision map shows the extension of that street through the tract. Seventy-ninth Street enters Arizona Avenue from the west a short distance north of the southerly point of the tract. An extension of that street through the subdivision would leave a triangular tip of land about 12½ feet wide by 75 feet to the southerly point. The proposed subdivision would include 10 residence lots north of the Seventy-seventh Street extension fronting on Arizona Avenue with 80-foot frontages and depths to Sepulveda Boulevard varying from 312 to 462 feet. Entrance to the residence lots would be from Arizona Avenue exclusively. The lot immediately north of and adjoining the Seventy-seventh Street extension is proposed to be used for business drive-in, and the lot south of Seventy-seventh Street for religious purposes.

The four conditions imposed by the planning commission and approved by the city council and the trial court are:

1. That a 10-foot strip abutting Sepulveda Boulevard be dedicated for the widening of that highway.

2. That an additional 10-foot strip along the rear of the lots be restricted to the planting of trees and shrubbery for the purpose of preventing direct ingress and egress between the lots and Sepulveda Boulevard.

3. That the extension of Seventy-seventh Street be dedicated to a width of 80 instead of 60 feet.

4. That the area which would be covered by an extension of Seventy-ninth Street and south to the point of the tri-

angle be dedicated for street use for the purpose of eliminating it as a traffic hazard.

The petitioner objected to the foregoing conditions on the ground that they were not expressly provided for by the Subdivision Map Act nor by city ordinance; that conditions 1, 2 and 4, and condition 3 insofar as it required dedication in excess of 60 feet in width, bear no reasonable relationship to the protection of the public health, safety or general welfare, and amount to a taking of private property for public use without compensation.

Article VIII (§§ 94 to 99½) of the Los Angeles City Charter deals with the department of city planning. By section 94 the department is given all the powers and duties which are granted to or imposed upon city planning commissions or departments by state law, and as provided by city ordinance, subject to article VIII. Pursuant thereto and to the Planning Act of 1929 (Stats. 1929, p. 1805 as amended; 2 Deering's Gen. Laws, Act 5211b), there is functioning in the city of Los Angeles a planning commission and a director of planning appointed by it who acts as the advisory agency of the commission. Section 95 of the charter requires the director of planning to prepare a master plan for the physical development of the city, and vests in him the powers and calls for discharge of the duties in relation to proposed subdivisions as required by the Subdivision Map Act and as may be imposed by ordinance. By section 96½ the planning commission is required to hold hearings on the master plan or parts thereof and consider and adopt the same.

Section 11525 of the Subdivision Map Act vests control of the design and improvement of subdivisions in the governing bodies of cities and counties, subject to review as to reasonableness by the superior court in and for the county in which the land is situated.

Section 11526 provides that the design, improvement and survey data of subdivisions and related matters, including procedure in securing official approval, are governed by the provisions of the Subdivision Map Act and by the provisions of local ordinances regulating the design and improvement of subdivisions.

Section 11538 makes it unlawful for any person to offer for sale or to sell any subdivision lot until the filing of a final map in compliance with the act and local ordinances. The conveyance of any part of a subdivision by lot or block num-

ber is not permitted until a final map has been recorded (§ 11539). Section 11550 declares that the initial action is the preparation of a tentative map with data as specified in the local ordinances and the map act.

Section 11551 states that if there is a local ordinance regulating the design and improvement of subdivisions the subdivider shall comply with its provisions before the map may be approved; but if there is no such ordinance the governing body as a condition precedent to approval may require streets and drainage ways properly located and of adequate width but may make no other requirements.

Section 11552 provides that if the subdivider is dissatisfied with the initial action regarding the tentative map he may appeal to the governing body which upon a noticed hearing shall take testimony as to the character of the neighborhood in which the subdivision is to be located, the kinds, nature and extent of improvements, the quality or kinds of development to which the area is best adapted and any other phase of the matter it may desire to inquire into, at the conclusion of which the governing body may make such findings as are not inconsistent with the provisions of the act or local ordinances.

The words "Design" and "Improvement" as used in the act are defined. Section 11510 provides that "Design" refers to street alignment, grades and widths, alignment and widths of easements and right of ways for drainage and sanitary sewers and minimum lot area and width. Section 11511 defines "Improvement" as only such street work and utilities to be installed, or agreed to be installed, by the subdivider on the land to be dedicated for streets, highways, etc., as are necessary for the general use of the lot owners in the subdivision and local neighborhood traffic and drainage needs.

Ordinance No. 79310 of the city of Los Angeles, as amended, prescribes the rules and regulations governing the platting and subdividing of lands and the filing and approval of subdivision maps. The ordinance adopts the definitions for "Design" and "Improvement" as declared in the Subdivision Map Act. Specifically treated are such subjects as primary and secondary streets, which are to conform to the master plan of traffic arteries, alignments, street widths, grades, curves and tangents, intersections, dead-ends, rounding block corners, private streets, alleys, size, frontage and side lines of lots, blocks, sewer and drainage grades and facilities, existing improvements, dangerous areas, easements, walkways, and

the like. Under ''Conditions of Acceptance'' it is provided that the city engineer may refuse to accept any final map which does not conform to the provisions of the Subdivision Map Act, the provisions of the ordinance, or the conditions of approval of the tentative map. It is also provided that upon recommendation of the advisory agency or the city engineer such variations may be made as in the exercise of sound, reasonable judgment may be warranted or required because of the size, use, physical or other conditions of the property, or the type of subdivision, except that no variations may be made as to the requirements of the Subdivision Map Act.

It appears to be the petitioner's contention that no condition may be exacted which is not expressly provided for by the Subdivision Map Act or the ordinance provisions not in conflict therewith; that at all events the requirements may deal only with streets to be laid out by the subdivider within the confines of the subdivision to take care of traffic needs therein, and that no dedication may be exacted for additions to existing streets or highways.

It must be obvious at the outset that this effect may not be drawn from the statute or from the city's organic law or ordinances. The foregoing review of those provisions does not indicate that the authority of the city planners is so circumscribed. The status of an autonomous city (Const. art. XI, § 6; *West Coast Advertising Co.* v. *San Francisco,* 14 Cal. 2d 516 [95 P.2d 138]; *City of Oakland* v. *Williams,* 15 Cal. 2d 542 [103 P.2d 168]) is recognized by express references to city ordinances in the Subdivision Map Act. Where as here no specific restriction or limitation on the city's power is contained in the charter, and none forbidding the particular conditions is included either in the Subdivision Map Act or the city ordinances, it is proper to conclude that conditions are lawful which are not inconsistent with the map act and the ordinances and are reasonably required by the subdivision type and use as related to the character of local and neighborhood planning and traffic conditions.

The petitioner relies on section 11551 of the act which purports to limit authority to impose conditions in the absence of local ordinances, and on the definition of the word ''Improvement'' in section 11511. But here the applicable provisions of the ordinances and of the act do not restrict reasonable conditions to provide streets and highways in relation to the local and neighborhood traffic needs. The

word "Improvement" as used in the act refers only to such improvements as are *to be installed by the subdivider* on the land to be dedicated to those needs. Implicit therein is the recognition that reasonable conditions may be imposed for the dedication of land for necessary purposes which is not to be improved by the subdivider. The provisions of the act do not impose the restrictions or limitations on the land which may be dedicated as invoked by the petitioner, but merely constitute a definition of the word "improvement" as used in the act. If the dedications for the widening of Sepulveda Boulevard and for the elimination of the southern tip of the triangle are otherwise lawfully required it can be no source of complaint to the petitioner that he is not required to make the improvement as well as the dedication. The trial court correctly determined that the conditions imposed were not precluded by the act.

■ The Subdivision Map Act (§ 11552) and the city ordinances indicate that the matters for consideration in relation to the reasonableness of imposed conditions contemplate the character of the neighborhood, the kinds, nature and extent of improvements, the quality or kinds of development to which the area is best adapted, the traffic needs, and other phases, including the size, use, physical or other conditions of the property, and the type of subdivision.

As to condition 1, that a 10-foot widening strip be dedicated, the finding is that the widening of Sepulveda Boulevard had been in contemplation by the authorities whether or not the petitioner intended to subdivide; but that the creation and the proposed uses of the subdivision would give rise to traffic and other conditions necessitating the widening of the boulevard; that the widening was necessary for and would benefit the lot owners, and that the requirement was reasonably related to the protection of the public health, safety and general welfare.

With regard to condition 2, that an additional 10 feet be reserved for a planting strip, the court found that such a strip was already in contemplation, but that the creation of the subdivision necessitated the restricted use to confine ingress and egress to and from the lots away from Sepulveda Boulevard; to screen the lot owners from the traffic noises, fumes and views of the fast-moving traffic on the boulevard; to provide safety islands for residents crossing the boulevard on foot and waiting lanes for vehicular traffic, and that the imposition of the condition was reasonably related to the

protection of the public health, safety and general welfare.

It was found that the foregoing pattern of subdivision, including the widening and planting strips in the development of Sepulveda Boulevard frontage, was in conformity with neighborhood plan and design, and had been carried out without objection by the petitioner and others in the district until the filing by petitioner of the tentative map for subdivision of his 13 acres. Variations in some requirements, changes in or abandonment of others, delays in making improvements, incompleteness of the master plans or failure to indicate thereon the precise details, the court found to be minor, not unauthorized, and without adverse bearing on the lawfulness or reasonableness of the conditions imposed.

The finding as to condition 3, respecting the required 80-foot width of the Seventy-seventh Street extension through the tract, was covered by the trial court's general conclusion that there was no unreasonable application of the Subdivision Map Act as to any of the conditions objected to by the petitioner.

Specifically as to condition 4, the dedication to eliminate the southerly tip of the triangle, it was found that without regard to the subdivision it had been the intention to project Seventy-ninth Street either across the petitioner's tract or below it; also that the subdivision would give rise to and create traffic conditions and hazards necessitating the elimination of the tip for the proper control of traffic in the locality, would benefit the lot owners in the proposed subdivision, and was reasonably related to the protection of the public health, safety and general welfare.

All intendments must be indulged to sustain the findings and judgment. Consideration alone of the physical facts and conditions, remembering also that the trial judge viewed the locality, indicate sufficient support therefor.

The contentions respecting the required width of the Seventy-seventh Street extension will not be further discussed except to note that the proposed business and religious uses of the respective abutting lots and the fact that Seventy-seventh is the only street to transverse the tract between Sepulveda Boulevard and Arizona Avenue, sufficiently support the conclusion that the required width is reasonably related to the potential traffic needs.

The petitioner does not quarrel with the conclusion that the other conditions are desirable and that their fulfillment will accomplish the ends stated. His more specific

complaint is that the city contemplated taking the property for the purposes indicated in any event, that the benefit to the lot owners and the tract will be relatively small compared to the beneficial return to the city at large; therefore that the requirements amount to an exercise of the power of eminent domain under the guise of pursuing the authority of subdivision map proceedings, and that the exercise thereof is unconstitutional unless compensation be paid.

In his arguments the petitioner appears to have lost sight of the particular type of lot subdivision and uniformity of neighborhood design and plan theretofore applied in the locality, including the requirement for strip dedication for widening purposes and strip restriction to planting use without dedication. As stated, consideration of these matters is not precluded by the provisions of the Subdivision Map Act, but on the contrary both the statutory provisions and the local law indicate that the subdivision design and use should conform to neighborhood planning and zoning requirements. Here the greater than average depth of the lots minimizes the land loss and street improvement cost. In fact it may be said that the petitioner's position would seem to be greatly improved by this type of subdivision and its related requirements in conformity with neighborhood planning and zoning.

The regular design of subdivision, with ingress and egress to and from Sepulveda Boulevard, would have been out of harmony with the neighborhood plan and traffic needs. It would have required dedication and improvement by the petitioner of lateral service roads and lanes for diversion of the local traffic to and from the main artery which the evidence shows would have used more land than for the widening and planting strips, and would have increased the cost of the improvements to be installed by the petitioner. The record indicates that the so-called cellular design was generally adopted because it interfered less with the free flow of traffic, minimized the hazards on the main thoroughfares, and reduced land dedication and improvement expense. The petitioner and the lot owners in the subdivision will participate in these benefits and savings by the selection of and adherence to the particular design. In fact the petitioner makes no objection to that design as such. It is to be assumed that he prefers it with the resulting savings in land and cost. But he seeks in addition compensation for the fulfillment of the conditions which make this type of lot subdivision feasible. Similar observations apply to the dedication of the southerly

tip of the triangle. The petitioner could reasonably be required to provide for the dedication and improvement of the extension of Seventy-ninth Street through the tract to provide safe turning for traffic to and from the subdivision, and incidentally to eliminate as a traffic hazard the practically useless remainder of the tip. He has lost nothing by the requirement for dedication and is benefited by being relieved of the burden of improvement. The conclusion is justifiable that the widening and planting strips and the elimination of the hazardous tip are as much a part of design and improvement within the proposed subdivision as would the lateral and transverse service roads and lanes had the regular or non-cellular design been selected.

　　■ Questions of reasonableness and necessity depend on matters of fact. They are not abstract ideas or theories. In a growing metropolitan area each additional subdivision adds to the traffic burden. It is no defense to the conditions imposed in a subdivision map proceeding that their fulfillment will incidentally also benefit the city as a whole. Nor is it a valid objection to say that the conditions contemplate future as well as more immediate needs. Potential as well as present population factors affecting the subdivision and the neighborhood generally are appropriate for consideration. Nor does the fact that master plans are incomplete, or that the specific details are not shown thereon, affect the result. It was in evidence that the city had been working toward the formulation of a complete and entire master plan, although all the elements or parts thereof were not as yet in the final stage of completion. ■ The contention that the requirements for a master plan or some over-all plan must be approved and adopted before authority vests in relation to the conditions here imposed is without merit since in any event the charter contemplates that portions thereof may be adopted. It is inconceivable that a master plan including all essential factors for a growing city could be completed in a short period of time. The trial court correctly concluded that delay in the adoption of the final master plan or plans had no material bearing on the controversial issues in this proceeding. The reasonableness of the conditions and the authority to impose them do not necessarily depend upon their inclusion in the official master plan for the district. As noted, subdivision design and improvement obviously include conformance to neighborhood planning and zoning, and it may properly be said that the formulation and acceptance of the uniform

conditions in the development of the district constitute the practical adoption of a master plan and zoning requirements therefor. ■ Nor is there merit in the petitioner's contention that a uniform plan is lacking because of some discrepancies in uniformity or delays in enforcement or fulfillment of the conditions. Time, funds and manpower are requisites to execution, and lack of speed in accomplishment, or some changes because of differing circumstances as to use or otherwise, cannot defeat the otherwise uniform and reasonable application of the imposed conditions in a growing community.

■ The petitioner may not prevail in his contention that, since the use of the land for the purposes stated was contemplated in any event, the dedication and use reservation requirements in this proceeding are unconstitutional as an exercise of the power of eminent domain. A sufficient answer is that the proceeding here involved is not one in eminent domain nor is the city seeking to exercise that power. It is the petitioner who is seeking to acquire the advantages of lot subdivision and upon him rests the duty of compliance with reasonable conditions for design, dedication, improvement and restrictive use of the land so as to conform to the safety and general welfare of the lot owners in the subdivision and of the public. The well-considered observations in *Mansfield & Swett* v. *Town of West Orange*, 120 N.J.L. 145 [198 A. 225], also involving a subdivision proceeding, are pertinent in this connection. The court there recognized the distinction between the exercise of the sovereign power of eminent domain and the noncompensatory nature of reasonable restrictions in respect to private interests when they must yield to the good of the community. That these general principles apply in subdivision map proceedings is also demonstrated in the cases of *Ridgefield Land Co.* v. *City of Detroit*, 241 Mich. 468 [217 N.W. 58], and *Newton* v. *American Sec. Co.*, 201 Ark. 943, 948 [148 S.W.2d 311], where the distinction was made between the exercise of authority in such proceedings and the exercise of the power of eminent domain. In each of those cases it was held that the requirement for the dedication of land to the widening of existing streets was not a compulsory taking for public use; but that where it is a condition reasonably related to increased traffic and other needs of the proposed subdivision it is voluntary in theory and not contrary to constitutional concepts.

In *Village of Euclid* v. *Ambler Realty Co.*, 272 U.S. 365 at 387 [47 S.Ct. 114, 71 L.Ed. 303] (1926) it was observed

that regulations, the wisdom, necessity and validity of which as applied to existing conditions were so apparent that they are now uniformly sustained, would probably have been rejected as arbitrary and oppressive a century or even a half a century ago; that while the meaning of constitutional guaranties is invariable, the scope of their application must expand or contract to meet the physical changes which are constantly coming within the field of their operation; and that only those regulations must fall which clearly do not meet the constitutional meaning as applied to changing conditions. Similar expressions are found in *Miller* v. *Board of Public Works,* 195 Cal. 477, 484-485 [234 P. 381, 38 A.L.R. 1479] ; *Zahn* v. *Board of Public Works,* 195 Cal. 497, 513 [234 P. 388] ; and *Dwyer* v. *City Council,* 200 Cal. 505, 514 [253 P. 932] (1927). These declarations by the Supreme Court of the United States and of this state more than 20 years ago are also pertinent in this case to uphold the conclusions of reasonableness based on the record.

No sufficient reasons have been advanced which would justify this court in overturning the findings of the trial court as to the authority for and the reasonableness of the conditions imposed.

The judgment is affirmed.

Gibson, C. J., Edmonds, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I dissent.

Inasmuch as it has been concluded by the majority that the conditions here involved were validly imposed under the police power, it becomes necessary to discuss appellant's contention that the conditions imposed (with the exception of condition No. 3) constitute an exercise of the power of eminent domain disguised as the police power.

First, I would like to point out that the proposed projection of Seventy-ninth Street (which would leave an isolated tip or triangle on the proposed subdivision) has been abandoned. It is this triangle which it is proposed that appellant dedicate for street purposes (condition No. 2). The trial court found that ''since the institution of said action, the location and projection of Seventy-ninth Street in an easterly direction in and to Sepulveda Boulevard has been changed so that at the present time the plan of the City of Los Angeles with regard to the projection of Seventy-ninth Street is to

project said street into Sepulveda Boulevard at a point south of the tip of said tract so that the same will not intersect said tract or any portion thereof; . . .''

If the Subdivision Map Act is construed to mean that the city planning commission may require a dedication of land *to improve streets already in existence* from one who proposes to subdivide before his tentative map may be approved and recorded, regardless of the fact that there is no ordinance requiring such dedication, then it is my position that such a procedure is nothing more than a taking of appellant's property without making compensation therefor. It is my position, also, that such a construction flies in the face of the express words of the statute (§ 11551 Bus. & Prof. Code), and that by so doing, the majority have opened the door to the question of constitutionality. The question then presented is whether the required dedication goes beyond the police power and enters the field of eminent domain.

In *House* v. *Los Angeles County Flood Control Dist.*, 25 Cal.2d 384, 388 [153 P.2d 950], this court said: ''While the police power is very broad in concept, it is not without restriction in relation to the taking or damaging of property. When it passes beyond proper bounds in its invasion of property rights, it in effect comes within the purview of the law of eminent domain and its exercise requires compensation. (*Varney & Green* v. *Williams*, 155 Cal. 318 [100 P. 867, 132 Am. St.Rep. 88, 21 L.R.A.N.S. 741] ; *Pacific Telephone etc. Co.* v. *Eshleman*, 166 Cal. 640 [137 P. 1119, Ann.Cas. 1915C 822, 50 L.R.A.N.S. 652] ).''

So far as the construction of improvements is concerned, however, even though their purpose be to promote and insure the public safety and convenience, the right of the state to take ''private property'' without the payment of ''just'' compensation, has been expressly forbidden by both the eminent domain provision of the state Constitution and the due process clause of the Fourteenth Amendment to the Constitution of the United States. (Cal. Const., art. I, § 14; *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U.S. 226 [17 S.Ct. 581, 41 L.Ed. 979].) Obviously, under these provisions, if the state (or its subdivisions) appropriates the land itself for a public use, it is exercising its power of eminent domain with a corresponding liability to pay the owner the value of the land.

The majority say that the 10-foot widening strip needed for Sepulveda Boulevard (condition No. 1) is necessary and reasonably related to the protection of the public health, safety

and general welfare. In *Mansfield & Swett* v. *Town of West Orange*, 120 N.J.L. 145 [198 A. 225], which is, incidentally, one of the very few cases relating to subdivisions, this theory was expressly exploded. ''Nor do we think that increased traffic hazards constitute a valid objection to the development. It is not a sound argument that the subdivision will attract additional dwellers, and thereby increase the volume of traffic and create the need for additional police supervision. These are mere incidents of municipal growth. The proposed developments, if surrounded with reasonable safeguards, will plainly not create abnormal traffic hazards inimical to the public welfare.'' And in *House* v. *Los Angeles County Flood Control Dist., supra,* Mr. Justice Curtis, speaking for the majority of this court, said: ''Thus there is recognized the incontestable proposition that the exercise of the police power, though an essential attribute of sovereignty for the public welfare and arbitrary in its nature, cannot extend beyond the necessities of the case and be made a cloak to destroy constitutional rights as to the inviolateness of private property.''

In *Bacich* v. *Board of Control,* 23 Cal.2d 343, at 351 [144 P.2d 818] : ''. . . it is said that in spite of that so-called policy 'the courts cannot ignore sound and settled principles of law safeguarding the rights and property of individuals. This [improvement] may be of great convenience to the public generally, but the properties of abutting owners ought not be sacrificed in order to secure it'; and, quoting from Sedgwick on Constitutional Law: 'The tendency under our system is too often to sacrifice the individual to the community; and it seems very difficult in reason to show why the State should not pay for property which it destroys or impairs the value, as well as for what it physically takes. . . . (*Liddick* v. *City of Council Bluffs,* 232 Iowa 197 [5 N.W.2d 361, 372, 382] ).

''In some degree those opposed policies are manifested in the conflict between the constitutional mandate that compensation be paid when private property is taken or damaged for a public purpose and the exercise of police power where compensation need not be paid. The line between those two concepts is far from clearly marked. . . . It does not appear that any *compelling emergency or public necessity* required its construction without the payment of compensation for property damaged. Therefore the State may not escape the payment of compensation under the police power.'' [Emphasis added.]

The majority say that the petitioner may not prevail in his contention that, since the use of the land for the purposes stated was contemplated in any event, the dedication and use reservation requirements in this proceeding are unconstitutional as an exercise of the power of eminent domain. "A sufficient answer [say the majority] is that the proceeding here involved is not one in eminent domain nor is the city seeking to exercise that power." Why is this a sufficient answer? Is a court to be precluded from a determination of whether or not constitutional mandates have been disobeyed because of the *form* a proceeding takes? It would seem that because the conditions imposed were said to have been imposed under the police power this court should be precluded from determining whether or not such was the case.

The majority rely on the "well-considered" cases of *Mansfield & Swett* v. *Town of West Orange, supra,* and *Ridgefield Land Co.* v. *City of Detroit,* 241 Mich. 468 [217 N.W. 58] ; and *Newton* v. *American Sec. Co.,* 201 Ark. 943 [148 S.W.2d 311]. In the Mansfield case, which is not particularly applicable here, there is a great deal said to the effect that city planning is an exercise of the police power. I have no quarrel with that statement. The facts of that case are distinguishable from those here under consideration. There, a proposed subdivision of a 4½-acre lot was under consideration. On this lot was an old manor house which the subdivider proposed to destroy and build in a number of homes. This proposition was disapproved by the planning board for several reasons, among which was the fact that the surrounding property owners did not approve; that it would not conform to existing conditions in the area; that it would increase traffic hazards, fire hazards, and place upon the municipality the burden of additional policing and additional supervision of traffic, and that it would interfere with safety, health and general welfare in the community. The court held that none of these objections were valid in that planning was done as an exercise of the police power and for the benefit of the public.

The Ridgefield Land Company and Newton cases support the view taken by the majority, but the reasoning leaves much to be desired, despite the adjective applied by the majority. In the Ridgefield case, it was said: "In theory at least, the owner of a subdivision voluntarily dedicates sufficient land for streets in return for the advantage and privilege of having his plat recorded." As authority for this proposition, the courts cites *Ross* v. *U. S. ex. rel. Goodfellow,* 7 App.D.C. 1,

to the effect that: "It must be remembered that each owner has the undoubted right to lay off his land in any manner that he pleases, or not to subdivide it at all. He cannot be made to dedicate streets and avenues to the public. If public necessity demands parts of his land for highways, it can be taken only by condemnation and payment of its value. But he has no corresponding right to have his plat of subdivision so made admitted to the records.

"In providing for public record Congress can accompany the privilege with conditions and limitations applicable alike to all persons. In providing for such record in the Act of 1888 (25 Stats. 451) Congress sought to subserve the public interest and convenience by requiring practical conformity in all subdivisions of land into squares, streets and avenues, with the general plan of the city as originally established, and this, regardless of the fact that it might, in instances, practically coerce the dedication of streets to public use which would otherwise have to be paid for."

The word "coerce" is particularly applicable in the case under consideration. Section 11538 (Bus. & Prof. Code) provides: "It is unlawful for any person to offer to sell, to contract to sell or to sell any subdivision or any part thereof until a final map or record of survey map thereof in full compliance with the provisions of this chapter and any local ordinance has been duly recorded or filed in the office of the recorder of the county in which any portion of the subdivision is located." Section 11539 provides: "Conveyances of any part of a subdivision shall not be made by lot or block number, initial or other designation, unless and until a final map has been recorded." Section 11541: "Any offer to sell, contract to sell or sale contrary to the provisions of this chapter is a misdemeanor, and any person, firm, or corporation, upon conviction thereof, shall be punishable by a fine of not less than twenty-five dollars ($25) and not more than five hundred dollars ($500), or imprisonment in the county jail for a period of not more than six months, or by both such fine and imprisonment."

In the three cases relied upon by the majority (*Mansfield & Swett* v. *Town of West Orange, supra*; *Ridgefield Land Co.* v. *City of Detroit, supra,* and *Newton* v. *American Sec. Co., supra*), it would seem that the only penalty provided for in the event that the proposed subdivision was not approved was that the plat could not be recorded. These cases do not

involve a fine or imprisonment, or both, as contemplated by the Map Act.

The construction placed upon the Subdivision Map Act by the majority has the effect of telling the subdivider that he may dedicate land to the city for the privilege of recording and selling—a matter which is not a privilege, but a *right*, in other situations, or let the land go idle, or sell it and go to jail, pay a fine, or both. This, it appears to me, amounts to a form of duress that is reminiscent of the type of practice which prevailed in another country prior to the last great war.

It is true that in *Archer* v. *City of Los Angeles,* 19 Cal.2d 19, 23, 24 [119 P.2d 1], a majority of this court said: ''The state or its subdivisions may take or damage private property without compensation if such action is essential to safeguard public health, safety, or morals. [Citing cases]. In certain circumstances, however, the taking or damaging of private property for such a purpose is not prompted by so great a necessity as to be justified without proper compensation to the owner. [Citing cases]. The liability of the state under article I, section 14 of the California Constitution arises when the taking or damaging of private property is not so essential to the general welfare as to be sanctioned under the 'police power' [citing cases], and the injury is one that would give rise to a cause of action on the part of the owner independently of the constitutional provision.'' [Citing cases.] This is a doctrine of stateism with which I positively disagree as appears from my dissenting opinion in that case.

Manifestly, the correct test of whether or not the 'police power has been properly exercised is not and never has been the degree of public necessity. To be appropriate it must be for the public health, safety, morals, or general welfare. We should all agree upon that. But if the degree of public necessity be the test, then the constitutional guarantee of just compensation for property taken for a public use is completely and forever abrogated. If a legislative body finds that public necessity requires the taking of property for highways, for streets, for a water supply, for recreational areas, for hospitals, for schools or other public buildings, or for a myriad of other public purposes, the courts must accept such a finding as conclusive. If such a finding is all that is necessary to warrant the exercise of the police power, there will be no occasion for the state or other public agency ever paying for any private property taken or damaged for a public improvement. Who may say that property for schools, highways,

streets, etc., is not absolutely necessary for the proper functioning of the government? Indeed, it is an indispensable factor in the exercise of the power of eminent domain where compensation is payable, that the public convenience and necessity demand the taking or damaging of any private property involved in the public improvement contemplated. Thus, under the theory advanced in the majority opinion, in any case that the power of eminent domain may be properly exercised, the police power could also be invoked with the result that no compensation could be recovered. Although it is difficult to charter the dividing line between the exercise of the two powers, it should be said that police power operates in the field of regulation, except possibly in some cases of public emergency, such as a fire, where buildings may be destroyed, rather than in the taking of property for some public improvement. ''But the moment the legislature passes beyond mere regulation, and attempts to deprive the individual of his property, or of some substantial interest therein, under pretense of regulation, then the act becomes one of eminent domain, and is subject to the obligations and limitations which attend an exercise of that power. . . . Under the one [police power], the public welfare is prompted [sic] by regulation and restricting the use and enjoyment of property by the owner; under the other [eminent domain], the public welfare is promoted by taking the property from the owner and appropriating it to some particular use.'' (Vol. I, Lewis, Eminent Domain (3d ed.), § 6, p. 14.)

In *Beals* v. *City of Los Angeles,* 23 Cal.2d 381, 387 [144 P.2d 839], Chief Justice Gibson, speaking for the majority of this court, said: ''We agree, however, with plaintiff's contention that the complaint states a cause of action. Closing of the alley results in the taking or damaging of private property for a public use. It is settled that the ascertainment and payment of damages is a condition precedent to the right of a city to do public work which will destroy or damage private property. [Cases cited.] The obligation to make compensation arises from the constitutional provision that 'Private property shall not be taken or damaged for public use without just compensation having first been made to, or paid into court for, the owner . . . (Cal. Const., art. I, § 14.) In *Bigelow* v. *Ballerino,* 111 Cal. 559, 564 [44 P. 307], which also involved the vacation of an alley, it is stated that, 'The constitutional rights of an owner of private property which is sought to be taken or damaged for public use are two: 1. The right to

compensation; and 2. The right to have that compensation made or paid into court before his property is taken or injuriously affected . . . *the property owner may rest secure in the protection which the constitution affords him that his property shall not be taken or damaged without compensation first made.* It is not incumbent upon him to demand that the authorities shall respect his rights; the duty is theirs to work no unlawful invasion of them.' " [Emphasis added.]

In *People* v. *Ricciardi,* 23 Cal.2d 390, 397 [144 P.2d 799], Mr. Justice Shenk, speaking for the majority of this court, said: "It is also the settled law that 'An abutting owner has two kinds of rights in a highway, a public right which he enjoys in common with all other citizens, and certain private rights which arise from his ownership of property contiguous to the highway, and which are not common to the public generally; . . . An abutting landowner on a public highway has a special right of easement and user in the public road for access purposes, and this is a property right which cannot be damaged or taken away from him without due compensation."

And yet, this same court now holds that certain land may be taken from a property owner for improvement of an existing street just because he wishes to subdivide his property adjacent thereto. If he chooses to build a house for himself and live there in solitary splendor, could the city require dedication of land for street widening purposes, or would it be required to pay him just compensation? What if he chooses not to subdivide and the proposed plan for widening Sepulveda Boulevard goes through?

The widening of the space for vehicle traffic in a street or other highway, by adding to the street or highway a strip of land of an abutting property owner, clearly gives the owner a right to compensation. (55 A.L.R. 896; *Fulton County* v. *Amorous,* 89 Ga. 614 [16 S.E. 201]; *Terrell County* v. *York,* 127 Ga. 166 [56 S.E. 309]; *Watkins* v. *Welch Grape Juice Co.,* 96 App.Div. 114 [89 N.Y.S. 47]; *Peckham* v. *Henderson,* 27 Barb. (N.Y.) 207; *Quantz* v. *Concord,* 150 N.C. 539 [64 S.E. 433]; *Re Girard Avenue* (Pa.), 11 Phila. 499; *Barnhart* v. *City of Grand Rapids,* 237 Mich. 90 [211 N.W. 96]; *Dow Arneson Co.* v. *City of St. Paul,* 117 Minn. 164 [225 N.W. 92]; *Sherlock* v. *Mobile County,* 241 Ala. 247 [2 So.2d 405]; *City of Raleigh* v. *Hatcher,* 220 N.C. 613 [18 S.E.2d 207].) There would appear to be no necessity for citing the numerous cases involving street widening done by the state, or its subdivisions, *under the power of eminent domain.*

I object to the following statement in the majority opinion as unsound and in conflict with settled law: "As noted, subdivision design and improvement obviously include conformance to neighborhood planning and zoning, and it may properly be said that the *formulation and acceptance of the uniform conditions* in the development of the district constitute the *practical adoption* of a master plan and zoning requirements therefor." [Emphasis added.] No authority is cited for this amazing statement which is directly contrary to one made by the same author in the case of *Kleiber* v. *City etc. of San Francisco,* 18 Cal.2d 718, 724 [117 P.2d 657]: "The act [Housing Authorities Law; Stats. Ex. Sess. 1938, p. 9; 2 Deering's Gen. Laws, Act 3483] also prescribed the powers, duties and obligations of the authority and of the city in carrying out its salutary purposes. Every necessary legislative act was completed by the legislature. There was nothing left to do except to administer the law. Governing bodies of cities, counties, or cities and counties perform both legislative and executive or administrative acts. The former is ordinarily performed by ordinance; the latter may be done by resolution. The steps to be taken by the city to gain the advantages afforded by the law are in the ascertainment of facts, and are administrative in character. *To gain those advantages the city must proceed in the manner specified in the act. Furthermore, since the statute is the only authority under which the city may act in the premises, and the subject matter of the action is of more than local concern, the city is bound to proceed in accordance therewith.* [Emphasis added.]

The Planning Act of 1929 as amended (Stats. 1937, ch. 665, p. 1817; 2 Deering's Gen. Laws, 1944 ed., Act 5211b, p. 1768) provides for the adoption by the city of a master plan, or portions thereof. The charter of the city of Los Angeles provides for the preparation of a master plan or portions thereof by the director of planning and the city planning commission and for the adoption thereof by the city council. The charter (art. III, § 21) also provides that "All legislative power of the city except as herein otherwise provided is vested in the Council and shall be exercised by ordinance, subject to the power of veto or approval by the Mayor as herein set forth. Other action of the Council may be by order or resolution, upon motion."

It would seem that the control of streets in a city—laying out, widening, etc.,—is a legislative power delegated by the state. (4 McQuillin, Municipal Corporations, p. 73; *Kellogg*

v. *Sherrill,* 24 Ohio App. 169 [156 N.E. 418].) And that any plan proposed by the planning commission for such streets must be established by ordinance adopted by the city council *as provided for by the city charter.*

McQuillin, speaking of city planning, has this to say: ''Manifestly all action on the part of the city in this, as in other respects, must be sanctioned by the law. No power can be exerted by its officers, or citizens however necessary or desirable unless it proceeds from legislative authority consistent with organic legal provisions, national and state. Inasmuch therefore as city planning and zoning involves interference more or less with the rights of persons and of property the path along which the city may safely move in this enterprise should be known, otherwise difficulties and failures are certain. If under the law as it now stands obstacles interpose they may be removed by knowledge of the city's political and legal status, its power and the source and construction thereof, including, of course, judicial decisions relating thereto which point out the purpose of constitutional guarantees and rights of persons and of property as such rights exist at the time of the action, and as they may be restricted in response to insistent reasonable public requirements by the particular community or the part thereof involved.'' (1 McQuillin, Municipal Corporations (2d ed.), p. 354.)

The same arguments are applicable to the requirement (condition No. 4) of a 10-foot strip of land for tree and shrub planting purposes. The Map Act does not contemplate the imposition of such a condition. The act refers to street alignment, grades, widths, easements, rights of way for drainage and sanitary sewers, minimum lot area and width, street work, utilities, highways and public ways. Assuming that this is a requirement analogous to a set-back line and that the director of planning may be authorized by ordinance to impose such a condition in the interests of the public health, safety, etc., there is still no *ordinance* so providing, and there is no such provision in the Map Act. As this court said in the Kleiber case, *supra,* ''the city must proceed in the manner specified in the act . . .''

I cannot agree with the majority of this court in the interpretation of the Subdivision Map Act (Bus. & Prof. Code, § 11500 et seq.) or with the interpretation of the only local ordinance which is applicable to the facts at hand. In my opinion, the statutes and the ordinance should be construed in the manner hereinafter set forth.

This case involves the interpretation of portions of the California Subdivision Map Act (Bus. & Prof. Code, § 11500 et seq.), certain ordinances of the city of Los Angeles, and the validity of the methods employed by respondent city in administering the same.

Appellant, a Los Angeles subdivider, pursuant to the Subdivision Map Act and certain ordinances of the city, submitted to the planning department of the city of Los Angeles a tentative subdivision map of a 13-acre tract in what is generally referred to as the Westchester District. After investigation, the city council of respondent adopted the recommendation of its planning commission and imposed upon appellant a number of conditions precedent to approval of the map. Appellant sought a writ of mandate in the trial court to require respondent city to approve the map without the imposition of the following four conditions:

(1) That appellant dedicate a strip 10 feet wide along the front of his tract for the widening of Sepulveda Boulevard on which his subdivision abuts;

(2) That appellant dedicate for street purposes the triangular southerly point or tip of his subdivision;

(3) That appellant dedicate a strip 80 rather than 60 feet in width for 77th Street which traverses the subdivision; and

(4) That appellant set aside a strip of land 10 feet in width in addition to the 10 feet needed for widening the boulevard for the planting of trees and shrubbery.

These four conditions were held by the trial court to have been validly imposed as a condition precedent to approval of the subdivision map.

Appellant contends: (1) That the State Planning Act of 1929 as amended (Stats. 1929, p. 1805, 2 Deering's Gen. Laws, Act 5211b, p. 1768) is applicable to the city of Los Angeles, and that respondent had neither conformed to its provisions, nor to the provisions of the Los Angeles City Charter requiring a master plan; (2) That the proper construction of the Subdivision Map Act did not permit the imposition of conditions (1), (2), and (4), or if a proper construction did so permit, that the act is unconstitutional in that the imposition of such conditions constituted an exercise of the power of eminent domain without compensation under the guise of the police power.

Article VIII of the charter of the city of Los Angeles (providing for a department of city planning) provides in

section 94½ thereof that the department shall be under the control and management of a director of planning. Section 95g provides that "He [the Director of Planning] shall make investigations and report on the *design and improvement* of all proposed subdivisions of land and shall have such powers and perform such duties *as are required by the Subdivision Map Act of the State of California.*" [Emphasis added.]

The Subdivision Map Act (Bus. & Prof. Code, *supra*) provides that any person, firm, corporation, partnership or association, causing land to be divided into a subdivision for himself or for others shall comply with certain formalities. Such subdivider must prepare and present to the governing body of the particular city or county a "tentative map" of the proposed subdivision and the existing conditions in and around it. *This map must comply with the provisions of the act and of any local ordinance passed by the governing body of the city or county.* It also provides that it is unlawful for any person to offer to sell, to contract to sell or to sell any subdivision or any part thereof until the proposed subdivision has been approved and a map thereof recorded.

The Business and Professions Code provides: Section 11506: " 'Local ordinance' refers to an ordinance regulating the *design and improvement of subdivisions,* enacted by the governing body of any city or county under the provisions of this chapter or any prior statute, *regulating the design and improvement of subdivisions,* in so far as the provisions of the ordinance are consistent with and not in conflict with the provisions of this chapter."

Section 11510: " 'Design' refers to street alignment, grades and widths, alignment and widths of easements and right of ways for drainage and sanitary sewers and minimum lot area and width."

Section 11511: " 'Improvement' refers to only such street work and utilities to be installed, or agreed to be installed, by the subdivider on the land dedicated or to be dedicated for streets, highways, public ways, and easements, as are necessary for the general use of the lot owners in the subdivision and local neighborhood traffic and drainage needs, as a condition precedent to the approval and acceptance of the final map thereof."

Section 11551: "In case there is a local ordinance, the subdivider shall comply with its provisions before the map or maps of a subdivision may be approved. *In case there is no local ordinance, the governing body may, as a condition*

*precedent to the approval of the map or maps of a subdivision, require streets and drainage ways properly located and of adequate width, but may make no other requirements.''*

Ordinance No. 79310 as amended by ordinances Nos. 81815, 83263 and 85666 was in effect at the time appellant submitted the map of the proposed subdivision here involved.

There was admitted in evidence a master plan for primary and secondary streets which had been approved by the city planning commission. There is no doubt that Sepulveda Boulevard falls within the ''primary street'' classification. This master plan had not been adopted by the city council by ordinance as the following excerpt from the testimony at the trial shows. Mr. Bennett, director of planning for the city of Los Angeles since 1941, after testifying that it was the proper procedure for the city council to adopt by ordinance any zoning map and text, was questioned, and answered as follows:

''Question: And Exhibit Y, which is the proposed master plan of traffic arteries for the city of Los Angeles, has that been adopted by the Council?

''Answer: No, sir.

''Question: Either by resolution or ordinance?

''Answer: No, sir.''

With respect to the condition on (No. 1, *supra*) imposed for the purpose of widening Sepulveda Boulevard, concededly a primary street, and upon which appellant's subdivision abuts, the ordinance makes no provision. The applicable section provides that ''all streets as far as practicable shall be in alignment with existing adjacent, connecting and surrounding streets.'' It does not provide that the subdivider must dedicate a portion of his property for the purpose of *widening* an adjacent street. The Subdivision Map Act provides that in case there is *no* local ordinance (and local ordinance refers to ''design and improvement''), the governing body may require that streets be *properly located* and of adequate width, but ''may make *no other requirements.*'' [Emphasis added.] (Bus. & Prof. Code, § 11551.) A reasonable construction of this section would appear to be that the governing body may require the subdivider to comply with the conditions as to width and location of streets *within* his subdivision. It makes no provision for the proposed widening of existing adjacent streets. Condition No. 4 deals with a proposed dedication or setting aside of an additional 10-foot strip for tree planting purposes. Again, neither the ordinance here involved, nor

the Subdivision Act makes any provision for this. It would therefore appear that conditions 1 and 4 were invalidly imposed under the Subdivision Map Act and the applicable ordinance.

Condition No. 2 involves the proposed dedication of the southerly triangular tip of plaintiff's proposed subdivision for street purposes. It is apparent from the record that at this point or tip two main traffic arteries meet, Arizona Street on the westerly side of appellant's subdivison and Sepulveda Boulevard on the easterly side. Mr. Dorsey, the traffic engineer, testified that the elimination of the point was necessary to reduce the traffic hazards at that intersection. He stated that the two fundamentals of traffic engineering involved were the reduction of the points of conflict where the flow of traffic on one street intersects that on the other street, and that the traffic movements should be brought as close to a right angle as possible. But respondents set forth in their brief that the condition was imposed for the purpose of widening either Sepulveda Boulevard or Arizona Street, *or both*. It is difficult to perceive how widening either or both of the streets would eliminate the so-called dangerous point. And, again, neither the ordinance nor the Subdivision Map Act makes provision for widening existing adjacent, connecting or surrounding streets.

The majority say that since "no specific restriction or limitation on the city's power is contained in the Charter, and none forbidding the particular conditions is included either in the Subdivision Map Act or the city ordinances, it is proper to conclude that conditions are lawful which are not inconsistent with the Map Act and the ordinances and are reasonably required by the subdivision type and use as related to the character of local and neighborhood planning and traffic conditions." The charter refers to the *"design and improvement* of all proposed subdivisions." The Subdivision Map Act provides that local ordinances regulating *"design and improvement"* may be enacted by the governing body of any city or county, and the words "design and improvement" are defined by the act. It is inconceivable how it can be said that the consistent use of these two words in the act and in the charter do not place a restriction upon the conditions which may be imposed. It seems very clear that the legislative intent was to provide for uniformity in subdivision planning with respect to streets, ways, drainage facilities, lot size, setback lines and the like *within* the proposed subdivision, and

that it was not contemplated that the city would widen its existing highways at the expense of the property owner. It is no answer to say that the subdivider cannot complain because he is not required to make the improvement as well as dedicate the land. Since the section defining "improvement" is expressly limited to mean the street work and utilities to be installed by the subdivider on land dedicated for such streets as are necessary for the use of the lot owners and local neighborhood traffic, the Legislature must have intended that the subdivider was to dedicate land only for streets within his subdivision. It cannot be contended seriously by anyone that the Legislature intended the subdivider to improve, at his own expense, a state highway such as Sepulveda Boulevard, and a street such as Arizona.

The charter provides that the director of planning shall have such other duties as are imposed upon him by ordinance. Assuming that the council could, by ordinance under the Map Act, place upon the director the duty of requiring dedication of property by subdividers for the purpose of widening existing streets, the fact remains that there is no such ordinance in existence.

The Los Angeles City Charter provides that the director of planning shall have such powers and perform such duties as are required by the Subdivision Map Act of the State of California, and in "addition to the foregoing, he shall have such additional powers and duties as may be imposed upon him by ordinance." Section 97 of the charter provides that no ordinance shall be adopted appertaining to certain matters unless approved by the city planning commission. Among those enumerated matters are set forth the following: "The acquisition, establishing, opening, widening, narrowing, straightening . . . of any public street, road, highway . . ." Thus it would seem that although the planning commission must approve, it was the clear intent that such matters should be covered by ordinance. It would appear, therefore, that condition No. 2 was invalidly imposed under the applicable laws in force.

With respect to condition No. 3, that appellant dedicate a strip of land 80 rather than 60 feet in width for the widening of 77th Street which traverses the subdivision, appellant concedes in his brief that it is a street "necessary for the general use of the lot owners in the subdivision and local neighborhood traffic." (Bus. & Prof. Code, § 11511.) From the record it appears that this condition was imposed to bring

the proposed extension of 77th Street into alignment with the existing portion of 77th Street on the westerly side of Arizona Street, and thus within the provision of the ordinance as previously set forth, that all streets shall be in alignment with existing, connecting streets, and that it was properly imposed under both the Subdivision Map Act (Bus. & Prof. Code, § 11551) and the applicable ordinance. Appellant's only contention with respect to the imposition of this condition is that the width required is "unreasonable." It is without merit. The state and its political subdivisions, acting in the interest of public health, welfare and safety, may make reasonable requirements. It is apparent from the record that the requirement of a width of 80 feet rather than 60 feet for 77th Street which traverses appellant's proposed subdivision is not an unreasonable or arbitrary requirement in the interests of the public safety and welfare. This condition is of the type contemplated by the Subdivision Map Act.

Appellant's contentions that the provisions of the Los Angeles City Charter and the state Planning Act of 1929 (2 Deering's Gen. Laws, Act 5211b, as amended) requiring a master plan had not been complied with in that there was no general, complete, over-all plan are without merit. The charter, section 96½ provides that a "master plan or *any part thereof*" may be adopted by the state Planning Act (assuming without deciding that it is applicable to the city) that: "The master plan, with the accompanying maps, diagrams, charts, descriptive matter and reports shall include such of the following subjects matter [sic] *or portions thereof* as are appropriate to the city, county or region. . . ." Thus it would appear that both legislative bodies did not intend that a plan, in its entirety, was to be necessary at any one particular time. A general plan for a city would include a plan for not only its subdivisions, street systems with their building lines or setbacks, but many other things necessary for a well-developed community. It cannot be seriously contended nor was it intended that a work of such magnitude could be accomplished overnight.

I would, therefore, reverse the judgment and direct the trial court to issue a writ of mandate directing the approval of the proposed map subject to compliance with condition No. 3 hereinabove set forth.

Schauer, J., concurred.