## CIRCUIT COURT OF ARLINGTON COUNTY

A & H Holding Corp. and
Donata Corp.

v.

Arlington County

March, 1973

Case Nos. (Chancery) 22976, 22977

By JUDGE CHARLES H. DUFF

These consolidated actions come before the Court upon Complainants' Bill seeking injunctive relief, mandamus, a declaratory judgment and damages. The Defendant has filed a cross-bill likewise seeking injunctive relief, a declaration of certain rights and also a monetary judgment for the sums allegedly due. Extensive testimony has been taken and the parties have filed briefs outlining their respective arguments and citing authorities on the points presented.

The Complainants are the owners of two office buildings in Rosslyn. The controversy between the parties arose when, on or about December 6, 1972, the Defendant served "Notices of Zoning Violation and Order of Correction" upon the tenants of Complainants' buildings. These notices ordered the tenants to correct an alleged violation of the zoning ordinance "by vacating the premises within ten days." The only violation asserted by the County is the fact that the Complainants were in default in the schedule of payments for their share of the construction of two pedestrian bridges as described hereafter.

The evidence taken at trial discloses that a comprehensive study was undertaken by the Defendant in

the early 1960s regarding the impact of the increased pedestrian and vehicular traffic occasioned by the redevelopment of Rosslyn. In December 1963 a Rosslyn Traffic Circulation Plan was adopted by the County Board. The plan contained such features as additional rights of way, separation of vehicular and pedestrian traffic, bus stops off the traffic lanes, etc. The County created a new "site plan" zoning procedure and its planning authorities recommended as part of the circulation plan a concept of pedestrian plazas and bridges between various of the proposed buildings to help achieve a free flow circulation of traffic. The purpose of the concept is described in Complainants' Exhibit 3 as follows:

> With such a system, the pedestrian will be provided greater comfort, safety and convenience than with a street level pedestrian movement. Equally important, however, will be the increased efficiency and safety afforded by the total circulation system. Conflict between pedestrian and vehicular traffic at peak hours would greatly impede the efficiency and reduce the safety of traffic flow. In addition, land is not available in Rosslyn for the additional traffic lanes which would be made necessary by the conflict of these traffic systems.

Under the site plan procedure, land could be developed to a greater height and density than permitted by normal zoning classifications. By approved site plans the County Board permitted the erection of buildings which made more intensive use of the land *in return for contributions by owners* to land use and circulation requirements. The evidence is clear that a condition of site plan approval was the agreement by the developers to construct their buildings so as to accommodate the erection of the pedestrian bridges. A further requirement imposed the obligation upon the complainants to contribute one-half of the cost over public property, up to a maximum of $20,000.00 for each bridge. The owner would pay the entire cost of the bridge over his own property. The parties concede that the buildings

involved herein were constructed in conformity with the plans and specifications. After inspection by the various interested County departments, an occupancy permit was issued for each building.

Upon completion of the bridge over North 19th Street, the County on May 22, 1969, advised Complainant owner that its share of the cost was $55,276.29 and made provision for four equal annual payments to commence August 1, 1969, and to terminate August 1, 1972. The evidence revealed further that one-half of the cost of this bridge over public property amounted to $13,177.86. Similarly, by letter of November 25, 1970, to the Donata Corporation, the County advised that the owner's share of the bridge cost across North Lynn Street was $50,670.39 and that one-half of the cost for that part of the bridge over public property came to $23,720.56 which was included in the above figure. Again four equal payment dates were stipulated commencing February 1, 1971, and terminating February 1, 1974.

The Complainants accepted in writing the proposals for payment and, in fact, made three annual payments on the 19th Street bridge. Only the fourth payment, that due August 1, 1972, in the amount of $14,648.21, has not been made and is allegedly owing. On the Lynn Street bridge, the first payment only was made, that due February 1, 1971. The remaining three payments, each in the amount of $12,667.60, are allegedly due and owing.

With this brief background the Complainants challenge, *inter alia*, the County's legal right to require them to contribute any sum whatsoever towards construction of the bridges; they assert that their agreement to contribute was made under duress and that the County had no authority to revoke the occupancy permits solely because their payments for the bridges were in default.

The County replies that in the exercise of its legitimate legislative function it had the right to require the Complainants to accept the bridge concept as a condition of site plan approval; that the acceptance of the bridge concept and the agreement to pay a share thereof were reasonable and proper and, indeed, were one of the conditions of approval of the site plan and of the issuance of the certificate of

occupancy; that the default in payments warrants the revocation of the occupancy permit, thus rendering continuing occupancy of the buildings illegal. The County also seeks a judgment for the amount presently owing by the Complainants.

The threshold question presented concerns the right of the County to require the pedestrian bridge concept in the first instance and further to require the Complainants to agree to contribute towards their construction. The evidence is entirely satisfactory to me that the bridge concept was for the salutary purpose of separating and facilitating both pedestrian and vehicular traffic. The studies made by the Planning staff confirmed the need for such separation and the then perhaps novel approach adopted promoted the purpose of the zoning ordinance as stated in section 15.1-489, Code of Virginia, namely "promoting the health, safety or general welfare of the public."

Nor do I find from the evidence that the County acted impermissibly in requiring contribution from the Complainants. Courts have long recognized the validity of conditions attached to the approval of subdivision plans or building permits that the developer dedicate a portion of his land for street widening purposes. As was stated in *Ayres* v. *City Council of Los Angeles*, 34 Cal.2d 31, 207 P.2d 1:

> When it is a condition reasonably related to increased traffic and other needs of the proposed subdivision it is voluntary in theory and not contrary to constitutional concepts. In other decisions involving land development, though not pertaining to subdivisions as such, the Courts have recognized that dedication can be required under the police power as a condition thereto.

Similarly, in *Fifty-Fourth St. Center* v. *Zoning Board*, 150 A.2d 335 (Pa.), it was held proper to require the owner to agree to certain improvements as a condition of a Certificate permitting use of the land as a parking lot. See also *Ridgefield Land Company* v. *City of Detroit*, 241 Mich. 468, 217 N.W. 58; *Newlon* v. *American Sec. Co.*, 201 Ark. 943,

148 S.W.2d 311; and *Village of Euclid* v. *Ambler Realty Co.*, 272 U.S. 365, 47 S. Ct. 114 (1926).

I find it difficult to recognize any substantial distinction between requiring dedication of a portion of one's realty for street widening purposes and contributing towards the cost of the pedestrian bridges in the cases at bar. In both cases the dedication or contribution is a condition required by and reasonably related to the increased traffic which will be caused by the development.

Apart, however, from the inherent right of the County to require contribution, the evidence taken at trial shows a voluntary agreement by the present Complainants to make the contribution. The Complainants' witnesses testified that at the County Board meeting where site approval was sought and obtained they agreed to "accept and go along with" the bridge concept. The documentary evidence in the case shows various instances of support and approval by the Complainants of the bridge concept. The payment schedule outlined by the County was approved by the Complainants and payments made thereunder until default. After the payments were delinquent there were various phone calls between Mr. Hunsberger and Mr. Paul Pomponio. The former testified that the latter agreed to bring the delinquent accounts current and cited financial difficulties in explanation.- Mr. Hunsberger testified that as recently as June 7, 1972, Mr. Peter Pomponio, in a discussion in the office of the Commonwealth's Attorney, asked for an extension of time for bringing the delinquent payments current, which extension was granted.

The Complainants do not deny the agreement to contribute but assert that it was made under such duress as to relieve them from any obligations thereunder. The only evidence of duress was the testimony of the Complainants' witnesses that they felt they had to accept the bridge proposal or the site plan would not be approved; they had experienced difficulty in a prior zoning matter; that they had numerous other matters pending before the County offices and that they felt that to actively oppose the bridge concept or payment therefor would jeopardize their good relations with the County in other matters. I have not considered this testimony lightly but

it must be weighed in balance with all of the other evidence in the case, including the actions of the parties prior to the institutions of these cases. The burden is upon the Complainants to show by a preponderance of the evidence that their agreement was under duress as defined by the law. I find as a matter of fact that the evidence does not preponderate in this respect.

In *City of Alexandria* v. *Texas Co.*, 1 S.E.2d 296, the City had no right to deny the change in zoning of the property and had no right to deny the permit for the erection of the filling station thereon; nevertheless it exacted from the property owner as the price for the granting of these privileges the surrender of its right to install lights on the property. The Court under these circumstances held the property owner's agreement not to install the lights to be illegal. The case is readily distinguishable on the facts from the case at bar. Similarly, in *Beachlawn Building Corporation* v. *City of St. Clair Shores*, 121 N.W.2d 427, the Court held that the increased building permit fees paid by a builder doing everything he could do to effectuate payment under protest were involuntary as being made under compulsion or duress of being denied the right to continue in its business unless it paid the unlawful exactions, so that it was entitled to sue for refunds. In that case the Court stated:

> Duress exists when one by the unlawful act of another is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will.

I am not of the opinion that the agreement made by the Complainants to contribute to the cost of the bridges was induced by any "unlawful" act of the County in the cases at bar.

The petitioners further contend that they were not treated equally with other developers, and that consequently the contribution procedure itself was unlawful. As a fundamental proposition both the law and simple concepts of fair play dictate that in its relationship with its citizens the County should accord similar treatment to those similarly situated. While differing in its factual context, the

language of the Virginia Supreme Court in *Andrews v. Board of Supervisors of Loudoun County*, 107 S.E.2d 445 is apropos:

> The provisions of an ordinance such as this must rest upon some rational basis or classification and apply alike to all persons and things falling within a designated class.

No less of a requirement should exist because of the site plan procedure. Substantial equality of treatment should be accorded applicants when they are in identical positions. Substantial variations must be based upon differing circumstances and conditions and must not be arbitrary. There is proof that the owners of a different bridge in Rosslyn were required to contribute only $12,500.00 towards the portion over public land. Likewise, there is evidence that the County did not require identity of design between the bridges, thus effecting savings for other owners. In the absence, however, of definitive proof that the bridges were of similar length, etc., it is difficult to make a finding that the treatment accorded other applicants was not substantially equal to that accorded the present Complainants. Furthermore, if such inequality did, in fact, exist I am not of the view that it would vitiate the requirement of the Complainants to comply with their voluntary agreement. In short, whatever rights such treatment might give the Complainants, it cannot serve as a defense to this action under the facts presented.

The final contention of the Complainants is that the Defendant was not authorized to revoke the certificates of occupancy by reason of default in the bridge payments. I can find no Virginia statute or County ordinance, nor has any been cited, dealing specifically with the question of revocation of occupancy permits. Section 32-D of the Arlington County Zoning Ordinance provides that every certificate of occupancy shall state that the building or the proposed use of the building or land complies with all provisions of law and all County ordinances. Mr. Caffo, the Zoning Administrator, testified that the inspections prior to the issuance of the certificate

were to ascertain if all requirements of the ordinance had been met. He cited one prior instance within his knowledge where a certificate of occupancy had been revoked.

It seems manifest that the purpose of the certificate of occupancy and its antecedent inspections is to insure compliance with the various requirements of law. Also undoubtedly underlying the entire procedure is the legitimate concern of public officials for the safety of the people who will actually occupy the building. Even though no specific statutory authority has been cited, common sense dictates that if a condition develops in a building or in the use thereof which threatens the health, safety or welfare of either those occupying the building or the public, the appropriate authorities have the legal right to revoke a certificate of occupancy.

It is conceded that both of the buildings in question were constructed in conformity with all requirements of law. The inquiry then is whether the default in payment threatened the health, safety or welfare of the public in such a manner as to authorize revocation of the permits. It is my judgment that the answer must be in the negative. The County has, in essence, a money claim against the Complainants; a debt is owing for which the County is entitled to a judgment. The debt, however, has no connection whatsoever with the public health, safety or welfare so as to justify the revocation of the certificate of occupancy.

Furthermore, an inspection of the certificates leaves considerable doubt as to whether, in point of fact, they were issued subject to the condition of payment for the bridges. The certificate issued for the Donata Building (Defendant's Exhibit 5) contains no language either expressly or inferentially conditioning its validity on payment. The certificate for the Pomponio Building does contain the following phrase: "construction of pedestrian bridges as agreed by Site Plan of January 25, 1964, will commence on demand by the County." Had the County demanded that construction proceed and the Complainants prohibited the same the enforceable condition might have been breached. It is uncertain, however, that the language quoted expressly imposes payment for the bridges as a

condition for the certificate. In *Town of Kearny* v. *Modern Transportation, Inc.,* 283 A.2d 199, the Court stated:

> It is offensive to fundamental concepts of justice and violative of due process of law, as a matter of substance to impose sanctions for violations of law, whose language is doubtful, vague and uncertain. Zoning limitations on the use of private property should be clearly and expressly imposed and should not be left to inference.

In *Willis* v. *Town of Woodruff,* 20 S.E.2d 699, the following comment appears apropos to the issue:

> When once the proper authorities grant a permit for the erection or alteration of a structure, if an applicant has made contracts and incurred liabilities thereon he acquires a kind of property right on which he is entitled to protection; and under such circumstances it is generally held that the permit cannot be revoked without cause or in the absence of any public necessity for such action.

It is the opinion of the Court that the Complainants had a vested right in the Certificate of Occupancy so long as those requirements of law relating to the public health, safety and welfare continued to be met. The requirement of payment for the bridges, if such was a condition of the Certificate, had no such relationship. While differing factually, the Virginia Supreme Court in the case of *Board of Supervisors of Fairfax County* v. *Medical Structures, Inc.,* 213 Va. 355 (1972), in a case of first impression emphasized the vested interest concept as follows:

> We hold that where as here a special use permit has been granted under a zoning classification, a bona fide site plan has thereafter been filed and diligently pursued and substantial expense has been incurred in

good faith before a change in zoning the permittee then has a vested right to the land described in the use permit and he cannot be deprived of such use by subsequent legislation.

The Court further finds that neither the Statute of Limitations nor the Statute of Frauds, as asserted by the Complainants in their brief, are applicable. It would appear, however, that there did exist a limitation of $20,000.00 on each bridge for that portion over public land. As the sum of $23,720.56 was charged to the Complainant for the bridge over North Lynn Street, the judgment in favor of the County must be reduced by $3,720.56.

As to the Complainants' assertion of damages sustained by the revocation of the Occupancy Permits, the evidence does indicate the loss of certain rentals as a result thereof. The County, however, has pleaded that it was acting in a governmental capacity as an arm of the Commonwealth of Virginia and as such it asserts the doctrine of sovereign immunity. Complainants contend, in essence, that the doctrine is outmoded and that the equities of the present situation require either its total disregard or a distinction permitting judgment against the County. The equity of this assertion aside, the law is clear in my mind that sovereign immunity is applicable and if it is to be abrogated, it should be by the legislature. See *Mann* v. *County Boarding*, 199 Va. 169, and *Richman* v. *Des Moines*, 215 N.W. 957.

In conclusion, and with respect to the prayers of the Bill of Complaint in each action, Paragraph A is denied; Paragraph B is granted; Paragraph C is granted. It is suggested that the suspension provided for in the Court's order of December 14, 1972, be made permanent. Paragraph D is denied.

As to the crossbill filed by the Defendant County, the judgment prayed for in Paragraph 1 will be granted for the two payments presently in default plus interest less the sum of $3,720.56; the judgment prayed for in Paragraph 2 will be granted; the prayers for declaratory judgment and injunction contained in Paragraphs 3, 4, 5 and 6 will be denied.