John CALL and Clark Jenkins,
Plaintiffs and Appellants,

v.

CITY OF WEST JORDAN, Utah,
Defendant and Respondent.

No. 15908.

Supreme Court of Utah.

Dec. 26, 1979.

Robert J. DeBry and Valden P. Livingston, Salt Lake City, for appellant.

Nick J. Colessides, Salt Lake City, for respondent.

CROCKETT, Chief Justice:

Plaintiffs John Call and Clark Jenkins, subdividers, brought this action in which they challenge the validity of an ordinance adopted by the defendant City which requires that subdividers dedicate 7 percent of the land to the city, or pay the equivalent of that value in cash, to be used for flood control and/or parks and recreation facilities. The district court upheld the validity of the ordinance and denied plaintiffs' request for injunctive relief and damages. The latter appeal.

Plaintiffs contend that the ordinance is invalid because: (1) it is not within the City's granted powers; (2) the land or the money required is not for the benefit of the subdivision, but rather the City as a whole; (3) that the City is attempting to exercise the power of eminent domain without following the requirements thereof and paying just compensation; and (4) it unlawfully imposes a tax.

On January 21, 1975, the City amended an existing ordinance (No. 33) relating to subdivisions by adding the following:

Section 9–C–8(a). In addition to all the other requirements prescribed under this ordinance *the subdivider shall be required to dedicate seven percent (7.0%) of the land area of the proposed subdivision* to the public use for the benefit and use of the citizens of the City of West Jordan . . . *or* in the alternative at the option of the governing body of the City, *the City may accept the equivalent value of the land in cash* if it deems advisable.

Sections 9–C–8(b) and (d) further provide that the money received "shall be used by the City for its flood control and/or parks and recreational facilities" and that if the City elects to receive money in lieu of land, payment shall be made "by the subdivider on or before final approval of the plat is given by the City Council."

On May 2, 1977, the plaintiffs presented to the City two plats and maps for a proposed "Wescall subdivision" which, if approved, would result in the future development of 92 lots on about 30 acres of land located in the City. When the City exercised its option to accept money in lieu of land, plaintiff Clark Jenkins paid, under protest, $16,576.00, representing about 7 percent of the value of his land. The City Council then approved the subdivision and the plats were recorded. The City refused plaintiffs' demand to refund the money and this action resulted.

In rejecting plaintiffs' attack upon the ordinance, the trial court stated in its memorandum decision:

As it affects the plaintiffs, it is the opinion of this Court that the City of West Jordan, Utah's ordinance 33, as amended January 21, 1975, is valid and constitutional. It is further the Court's opinion that there has been no taking of the plaintiff's property by the defendant without just compensation nor has the defendant levied an invalid tax upon the plaintiffs. See Secs. 10–9–1 through 10–9–30, U.C.A. 1953. [Citing cases.]

## The Authority of the City

■ It is not questioned that cities have no inherent sovereign power, but only those granted by the legislature.[1] But it must be realized that it is impractical for statutes to spell out to the last detail all of the things city governments must do to perform the

---

1. *Johnson v. Sandy City Corp.*, 28 Utah 2d 22, 497 P.2d 644 (1972).

functions imposed upon them by law. This Court has in numerous cases recognized this and has held that cities have those powers which are expressly granted and also those necessarily implied to carry out such responsibilities.[2]

There are a series of statutes through which the City derives its authority to enact ordinances of the character here in question. Sec. 10–8–84, U.C.A. 1953, grants to cities the authority and the duty

.  .  .  to preserve the *health, safety* and good order of the city and its inhabitants.

This idea is carried forward and echoed in Section 10–9–1, U.C.A. 1953, which provides that:

For the purpose of promoting *health, safety*, morals *and the general welfare* of the community *the legislative body of cities and towns is empowered to regulate* and restrict  .  .  .  *the* location and *use of* buildings, structures and *land for trade, industry, residence or other purposes.*

Further dealing with that subject and more specific as to the establishment of parks, Section 10–9–3 states that such regulations

.  .  .  shall be made in accordance with a comprehensive plan designed to .  .  .  *facilitate adequate provision for* transportation, water, sewage, schools, *parks and other public requirements.*

The Municipal Planning Enabling Act[3] empowers a city to have a planning commission which may "adopt and certify to the legislative body, a master plan for the physical development of the municipality."[4]

Section 10–9–22 states that the planning commission "shall have such powers as may be necessary to enable it to perform its functions and promote municipal planning."

Significantly, Section 10–9–25 then provides:

In exercising the powers granted to it by the act, *the planning commission shall prepare regulations governing the subdivision of land within the municipality.* A public hearing thereon shall be held by the legislative body, after which *the legislative body may adopt said regulations for the municipality.*

[all emphasis herein added.]

If the above statutes are viewed together, and in accordance with their intent and purpose, as they should be, it seems plain enough that the ordinance in question is within the scope of authority and responsibility of the city government in the promotion of the "health, safety, morals and general welfare" of the community.[5]

Just how essential and desirable it is that cities have such authority in planning their growth is brought into sharp focus by reflecting, on the one hand, upon the conditions in the slum and ghetto areas of various cities, where there are none, or inadequate, parks and playgrounds and, on the other, upon the enrichment of life which has been conferred on other cities where there are parks, plazas, recreational and cultural areas (some of which are very famous) for the use of the public.

In modern times of ever-increasing population and congestion, real estate developers buy land at high prices. From the combined pressures of competition and desire for gain, they often squeeze every lot they can into some labyrinthian plan, with only the barest minimum for tortious and circuitous streets, without any arterial ways through such subdivisions, and with little or no provision for parks, recreation areas, or even for reasonable "elbow room." The need for some general planning and control is apparent, and makes manifest the wisdom underlying the delegation of powers to the cities, as is done in the statutes above referred to.

As undeveloped land is improved, it is also important that some provision for flood control be made. To the extent that the

---

**2.** See *Salt Lake City v. Revene*, 101 Utah 504, 124 P.2d 537 (1942); and *Butt v. Salt Lake City Corp.*, Utah, 550 P.2d 202 (1976).

**3.** 10–9–19 et seq., U.C.A. 1953.

**4.** 10–9–20, U.C.A. 1953.

**5.** Language from Sec. 10–9–1, U.C.A. 1953.

establishment of subdivisions increases the need for flood control measures or recreational facilities, it is both fair and essential that subdividers be required to contribute to the costs of providing those facilities.

### Lack of Benefit to the Subdivision

■ In their point No. (2), the plaintiffs attack the ordinance on the ground that the land dedicated (or the money in lieu thereof) is not to be used solely and exclusively for the benefit of the created subdivision. They point to the provision that the land is received "for the benefit and use of the citizens of the City of West Jordan" and the money is used for "its [West Jordan's] flood control and/or parks and recreation facilities."

We agree that the dedication should have some reasonable relationship to the needs created by the subdivision.[6] But in the planning for the expansion of a city, it is obvious that no particular percentage of each subdivision, or of each lot, could be used as a park or playground in that particular subdivision; and likewise, that it could not be so used for flood control. But it is so plain as to hardly require expression that if the purpose of the ordinance is properly carried out, it will redound to the benefit of the subdivision as well as to the general welfare of the whole community. The fact that it does so, rather than solely benefiting the individual subdivision, does not impair the validity of the ordinance.[7]

■ These observations are also pertinent: Although the money which was collected from the plaintiffs in this case was deposited in the City's general fund, it should not be assumed that the money thus becomes usable for other purposes by the City and is of no special benefit to the area sought to be subdivided. On the contrary, that it will be used for its stated purpose is assured, first, by the integrity and good faith of the public officials charged with that responsibility; and second, by the fact that the recognized principle is that if money is collected from the public for a specific purpose, it becomes a trust fund committed to the carrying out of that purpose.[8]

### The Eminent Domain Issue

■ There is an obvious fallacy in the plaintiffs' argument that the City has not followed the proper procedure for taking plaintiffs' property under eminent domain. This is not a proceeding initiated by the City to acquire property.[9] It has indicated no desire to compel the plaintiff to subdivide their property, nor to dedicate any part of it. The plaintiffs are the moving parties, and as a prerequisite for permitting the creation of the subdivision, the City, under the powers conferred upon it as hereinabove discussed, can and does impose reasonable regulations.[10]

### Invalidity as a Tax

Plaintiffs urge that the requirements of the ordinance in question are but a revenue-raising scheme for the purpose of meeting the financial needs of the City, and thus constitute an improper levy of a tax upon their property. This labeling is but an ex-

6. See statements in *Aunt Hack Ridge Estates, Inc. v. Planning Commission of Danbury*, 27 Conn.Sup. 74, 230 A.2d 45 (1967); *Krughoff v. City of Naperville*, 68 Ill.2d 352, 12 Ill.Dec. 185, 369 N.E.2d 892 (1977); *Home Builders Ass'n v. City of Kansas City*, Mo., 555 S.W.2d 832 (1977).

7. *Ayres v. City Council*, 34 Cal.2d 31, 207 P.2d 1 (1949); *Associated Home Builders, Inc. v. City of Walnut Creek*, 4 Cal.3d 633, 94 Cal. Rptr. 630, 484 P.2d 606 (1971).

8. 15 McQuillin, Municipal Corporations, Sec. 39.45 states that: "Special funds are often created . . . for a particular purpose, and in such case the general rule is that they cannot be used for any other purpose" and that ". . . a fund raised by a municipality for a special purpose is a trust fund, and equity will, in a proper case, interfere to prevent its diversion." (Citing cases.)

9. See *Ayres v. City Council*, supra, note 7; *Petterson v. City of Naperville*, 9 Ill.2d 233, 137 N.E.2d 371 (1956).

10. *Billings Properties, Inc. v. Yellowstone County*, 144 Mont. 25, 394 P.2d 182, 187 (1964); *City of Albuquerque v. Chapman*, 77 N.M. 86, 419 P.2d 460 (1966); *Mid-Continent Builders, Inc. v. Midwest City*, Okl., 539 P.2d 1377 (1975).

ercise in semantics which misconstrues the purpose of the ordinance to make another attack upon it. It has been adjudicated that such an ordinance, if reasonably designed and carried out for the purpose intended, is a proper form of planning for the good of the community, and is not such a prohibited tax.[11]

■ The question as to the percentage of the land in the subdivision (in this instance, 7 percent) to be committed to the public purpose is within the prerogative of the City Council to determine, and so long as it is within reasonable limits, so that it cannot be characterized as capricious or arbitrary, the courts will not interfere therewith.[12]

■ In harmony with what has been said above, it is our opinion that the ordinance under attack is within the scope of the powers granted to the City so that it can plan for the general good of the community as well as for the newly-created subdivisions.

We have decided the principal issue which was addressed by the parties in the district court, and on this appeal, as to the validity of the ordinance. However, we observe that in the averments of the affidavits, there are other matters which may need to be resolved on remand; and accordingly, it is deemed appropriate that we make some additional comments.[13]

There is no question, but that the ordinance should be applied fairly, and without favoritism or discrimination insofar as that can be accomplished. In view of the averment in plaintiffs' affidavit that that principle has been violated, the trial court should be concerned with examination into and resolution of any legitimate issue raised thereon.

■ In his affidavit, plaintiff Clark Jenkins averred that he not only paid the $16,-576 (assumed to be 7 percent of the value of the subdivision, $248,000) but was also required to dedicate .028 acres valued at $1,500; and to expend about $19,000 in construction of a storm sewer (which plaintiff urges is flood control) before the City would approve the subdivision. He asserts that these amounts are in excess of the 7 percent required by the ordinance. The City's affidavit states that it received the $16,576, but says nothing about receiving the other amounts just referred to. It is, of course, essential that the amount the City exacts pursuant to the ordinance is not more than the 7 percent of value of plaintiffs' property it prescribes.

Our final observation is on plaintiffs' urgence that the $19,000 they expended in constructing a storm sewer should be credited upon their obligation under the ordinance. From what has been said in this decision, it should be sufficiently plain that the 7 percent exacted pursuant to the ordinance is for the general purpose of parks, recreation facilities and flood control, and is to be so administered and expended by the city government for that purpose; and that it is not necessarily to be used solely for the plaintiffs' subdivision or any other particular one. This does not in any way prevent the City from imposing other reasonable conditions upon the approval of a subdivision and proposed construction therein, including requiring a storm sewer if the conditions are such that it is needed in that subdivision for the protection of future residents thereof or other residents of the City. We therefore do not disagree with the City's requirement of the storm sewer, nor with its refusal to credit the plaintiff with the cost thereof on its 7 percent required by the ordinance.

The decision of the trial court is affirmed and the case is remanded for further pro-

11. *Petterson v. City of Naperville*, supra, note 9; *Jenad v. Village of Scarsdale*, 18 N.Y.2d 78, 271 N.Y.S.2d 955, 218 N.E.2d 673 (1966).

12. For an excellent discussion of the various constitutional challenges that have been made regarding subdivision legislation, see *Associat-* *ed Home Builders, Inc. v. City of Walnut Creek*, supra, note 7, and authorities therein cited.

13. See Rule 76(a), U.R.C.P.; *LeGrand Johnson Corp. v. Peterson*, 18 Utah 2d 260, 420 P.2d 615 (1966).

ceedings consistent with this opinion. No costs awarded.

HALL, J., concurs.

STEWART, Justice (concurring).

I concur in the conclusion that § 9–C–8(a) of the ordinance of the City of West Jordan is authorized by § 10–8–84 U.C.A. (1953), as amended. This statute delegates to cities general police power to be used for the benefit of the city and its inhabitants. However, the ordinance in question clearly approaches constitutionally protected rights, i. e., the prohibition against the taking of private property without just compensation. The power of a city, or for that matter of the state, to require subdividers to dedicate a portion of their land for public improvements is not without limitation. In my judgment, the Court should address the problem of what standards delineate a constitutional and an unconstitutional forced dedication by a subdivider. The question is certainly one that will recur and ought to be resolved by the Court.

WILKINS, Justice (dissenting).

I respectfully dissent.

The majority opinion forms a perilous new rule today by impermissibly expanding municipal powers, for the first time in this State, beyond those granted cities and towns by our Legislature and beyond those recognized by subdivision, zoning, and municipal government authorities, and it endangers the sound precedent of narrowly construing municipal powers which has been developed in *Salt Lake City v. Revene*,[1] *Ritholz v. City of Salt Lake*,[2] *Salt Lake City v. Sutter*,[3] *Tooele City v. Elkington*,[4] *Nance v. Mayflower Tavern*,[5] *Parker v. Provo City*,[6] *Nasfell v. Ogden City*,[7] *Bohn v. Salt Lake City*,[8] *Lark v. Whitehead*,[9] *American Fork City v. Robinson*,[10] *Layton City v. Speth*,[11] and other cases.

I shall relate my view of this case, as well as review what I perceive to be the correct legal principles applicable to it. All statutory references are to Utah Code Annotated, 1953, as amended, unless otherwise indicated.

Subdividers have undertaken to develop a subdivision within the City's boundaries and have dedicated land area and installed storm sewer facilities within the subdivision and have additionally paid $16,576 to the City, all in response to City demands made under authority of the Ordinance as a prerequisite to subdivision approval. The record and briefs indicate a dispute as to whether the land was dedicated and the money paid under protest. No formal written protest appears in the record, but plaintiffs claim they attended a city council meeting in which they orally objected to the land dedication and fee payment.

Subdividers framed their complaint as a class action seeking a declaration of the invalidity of the Ordinance on their own behalf and on behalf of others similarly situated. Other than a general denial in its answer and the allegation that the class consisted of 28 subdividers rather than the 100 alleged by plaintiffs buried within an affidavit on another subject, the City has totally failed to address, either here or below, the Subdividers' class action allegations. The record does not indicate whether the District Court made any of the determinations contemplated by Rule 23(a) or (b), Utah Rules of Civil Procedure, but the Court disposed of the matter in an Order dated April 21, 1978, denying the Subdividers' "Motion for Declaration of a Class Ac-

1. 101 Utah 504, 124 P.2d 537 (1942).

2. 3 Utah 2d 385, 284 P.2d 702 (1955).

3. 61 Utah 533, 216 P. 234 (1923).

4. 100 Utah 485, 116 P.2d 406 (1941).

5. 106 Utah 517, 150 P.2d 773 (1944).

6. Utah, 543 P.2d 769 (1975).

7. 122 Utah 344, 249 P.2d 507 (1952).

8. 79 Utah 121, 8 P.2d 591, 81 A.L.R. 215 (1932).

9. 28 Utah 2d 343, 502 P.2d 557 (1972).

10. 77 Utah 168, 292 P. 249 (1930).

11. Utah, 578 P.2d 828 (1978).

tion." The City's motion to dismiss was treated as one for summary judgment. On May 17, 1978, the District Court ruled in favor of the City's motion, and against the Subdividers' motion, that the Ordinance was valid and the City's demands were in conformity with it.

Except for cities which operate under charter [12] and derive their authority from Article XI, Section 5 of the Utah Constitution, the cities of this State are "creatures of statute and limited in powers to those delegated by the legislature, . . ." [13] All power and authority of our nonchartered municipalities is derived through legislative grant, and for the Ordinance under review here to be upheld, it must have been enacted pursuant to an enabling statute.

Prior to the majority decision here, this Court recognized that legislative authority may be exercised by municipalities in only one of three ways. Justice Wolfe wrote in *Salt Lake City v. Revene* :

It has been repeatedly stated by this court "that a municipal corporation possesses and can exercise the following powers, and no others: First, those granted in *express* words; second, those necessarily or fairly implied in or incident to the powers *expressly granted* ; third, those *essential* to the accomplishment of the declared objects and purposes of the corporation,—*not simply convenient, but indispensable*." 1 Dillon Municipal Corporation, 5th Ed., p. 448, § 237; . . . [14] [Emphasis added.]

and held therein that in the absence of a specific legislative grant of power the city had no authority to limit barbershop business hours for health purposes under three statutory grants of power to cities and towns. One statute provided cities power to "license, tax, and regulate" barbershops. A second statute empowered cities to promulgate regulations "to secure the gen-eral health of the city," and the third broadly delegated to cities authority to enact ordinances for the public health, safety, prosperity, morals, peace and good order, and comfort and convenience of the city and its inhabitants. That third statute now appears in our Code as § 10–8–84 and is relied upon by the City and the majority opinion as authority for the City to enact the Ordinance under attack here.

In *Salt Lake City v. Sutter*,[15] defendant's conviction for violating Salt Lake City's prohibition ordinance was reversed, this Court holding that the statute enabling cities to pass ordinances necessary to provide for the safety, health, morals, comfort and convenience, again the statute relied upon by the City and the majority opinion, did not authorize the City's legislation prohibiting possession of intoxicating liquors.

Whatever power or authority municipalities in this state have is derived from the Legislature.

It will hardly be contended that the ordinance in question is "essential to the accomplishment of the declared objects and purposes of the corporation." As we have seen, it is not included within any express grant; nor is it necessarily or fairly implied as an incident to the powers expressly granted measured by the rule laid down by the authorities.

It may be, and is, contended that the ordinance in question is only carrying out the general policy of the state as reflected by the legislative enactment making it an offense against the state law for any person to knowingly have in his possession without authority intoxicating liquors within the state. But the policy of the state cannot control in determining the powers of a municipality. Those powers must be measured and determined by the grants found in the charter or in the general laws purporting to enumerate such powers.

---

12. The City in this case does not represent itself to be chartered.

13. *Ritholz v. City of Salt Lake, supra*, note 2 at 3 Utah 2d 387, 284 P.2d 703.

14. *Supra*, note 1. Although cited by the majority as authority for its position here, Revene held, in direct conflict with the majority, that the Ordinance enacted by the City exceeded the City's authority under the enabling statutes.

15. *Supra*, note 3.

We can see no escape from the conclusion that the board of city commissioners of Salt Lake City was without authority to enact the ordinance in question on this appeal.[16]

The requirement that cities must have express authority to enact ordinances is not unique to Utah. McQuillin in *Municipal Corporations,* and Yokley, in *The Law of Subdivisions,* state as a general proposition that dedication ordinances require enabling legislation.

> In some jurisdictions, zoning-enabling statutes authorize local zoning bodies to require, as a condition precedent to development, that subdividers dedicate portions of their property for public purposes, or pay an assessment in lieu of dedication. There must be express statutory authority granting the power to municipalities to impose such conditions, or at least language from which the intention to grant the power may be inferred. . . .[17]

Further, judicial scrutiny of a municipal ordinance differs from that imposed in the test of a State statute in that the usual presumption of validity of the sovereign's action does not apply. In the case of an ordinance, any reasonable doubt must be resolved against the municipality's power to enact it, and any questioned power must be denied.[18]

Neither party nor the majority opinion cites any Utah statute directly authorizing the City's enactment of the Ordinance in this case. The City refers us only to § 57–5–3 [19] and to Title 10, Chapter 9 of the Utah Code Ann. The majority opinion finds authority for the City's action in § 10–8–84 and various sections in Title 10, Chapter 9, under the theory that the City was acting under those powers necessarily implied to it to carry out those powers expressly granted. Section 57–5–3 governs the nature of maps and plats a subdivider must file and have approved. Title 10, Chapter 9, is a Legislative grant of power to cities and towns for the purpose of enacting zoning regulations to promote the "health, safety, morals and general welfare of the community." Chapter 10 also includes the Municipal Planning Enabling Act, §§ 10–9–19 through 10–9–30, which empowers any city to adopt a master plan for the physical development of the municipality and to promulgate regulations to assure that subdivisions conform to the master plan. The City has adopted a master plan as contemplated by the Act.

Section 10–8–84 is a broad grant of the State's police powers to cities and towns and is frequently referred to as the "general welfare clause." [20] It is derived from Utah's earliest laws and states:

> They [the cities and towns] may pass all ordinances and rules, and make all regulations, *not repugnant to law, necessary for carrying into effect or discharging all powers and duties conferred by this chapter,* and such as are necessary

---

16. *Id.* at 61 Utah 540, 41, 216 P. 237. Also supporting this rule is *Tooele City v. Elkington, supra,* note 4.

17. 8 McQuillin, Mun.Corp. § 25.146a (Rev. 1976). 1 Yokley Mun. Corp. § 97 (Supp.1978, p. 179); *Accord,* Yokley, The Law of Subdivisions § 15 (1963).

18. *Nance v. Mayflower Tavern, supra,* note 5; *Parker v. Provo City, supra,* note 6; *Nasfell v. Ogden City, supra,* note 7; *Salt Lake City v. Revene, supra,* note 1.

19. *Maps and plats to be acknowledged, certified, approved, and recorded.* Such map or plat shall be acknowledged by such owner before some officer authorized by law to take the acknowledgment of conveyances of real estate, and certified by the surveyor making such plat; if the land is situated in any city or incorporated town such plat or map shall be approved by its governing body, or by some city or town officer for that purpose designated by resolution or ordinance of such governing body; . . .

See also § 57–5–4, which states:
Such maps and plats, when made, acknowledged, filed and recorded, shall operate as a dedication of all such streets, alleys and other public places, and shall vest the fee of such parcels of land as are therein expressed, named or intended for public uses in such county, city or town for the public for the uses therein named or intended.

20. *Bohn v. Salt Lake City, supra,* note 8; *Lark v. Whitehead, supra,* note 9.

and proper to provide for the safety and preserve the health, and promote the prosperity, improve the morals, peace and good order, comfort and convenience of the city and the inhabitants thereof, and for the protection of property therein;

. . .

Emphasis added.]

This section is not, however, authority for the Ordinance under attack here. Cases decided under this statute are emphatic and explicit in limiting its scope. In *Nasfell v. Ogden City*,[21] the city's power to enact an ordinance declaring that the presence of a vehicle parked in violation upon any public street was prima facie evidence that the registered owner committed the violation, was successfully challenged. Although Chief Justice Crockett reasoned there as here, that what is now Section 10–8–84 implied to the city the power to enact the ordinance, the Court held that the city had been granted no express authority to pass the ordinance, and that the city had no implied power to pass the ordinance based upon this general welfare statute or statutes granting cities the right to regulate the use of streets, traffic and sidewalks.

The Court has also characterized this statute as "merely in aid of the express powers elsewhere granted"[22] in invalidating a city ordinance prohibiting keeping a pool table or playing pool. And in *Lark v. Whitehead*;[23] Chief Justice Crockett again dissenting, the Court held that while the cities had been expressly granted Legislative authority to enact an ordinance punishing persons for indecent or disorderly conduct in § 10–8–50, Salt Lake City's ordinance exceeded that statutory grant, and that even under § 10–8–84, the statute relied upon in the majority opinion here, the city had no implied power to enact its ordinance.

The general provisions of Sec. 10–8–84 do not confer authority upon a municipal body to abrogate the limitations specified in the express provisions of Sec. 10–8–50, U.C.A.1953. In *Salt Lake City v. Sutter* this court cited the principle that where an express authority is given to pass ordinances in a particular class of cases, followed by a general authority to pass all necessary laws, the express authority is a limitation upon the general power so far as it relates to matters which belong to the class of those enumerated, but which are not, in terms, included. A general power granted to the corporation to pass all ordinances necessary for the welfare of the corporation, is qualified and restricted by those other clauses and provisions of the charter or the general law which specify particular purposes for which ordinances may be passed. Otherwise, the general clause would confer authority to abrogate the limitations implied from the express provisions.[24]

In *Layton City v. Speth*,[25] this Court set aside a conviction under a city ordinance which exceeded the statutory grant of authority from the Legislature. In *Layton City*, the city had enacted an ordinance making it illegal for a vehicle owner to knowingly and intentionally permit persons who possess, use, or distribute controlled substances to occupy his vehicle. The State statute in effect at the time the ordinance was enacted granted to cities the power to prohibit distribution of intoxicating liquors, narcotics or controlled substances to persons under the age of twenty-one. This Court held over the dissents of Chief Justice Crockett and Justice Hall, that the ordinance was not necessary for carrying into effect the purposes of the statute, was beyond the scope of Legislative authority granted to the city, and was therefore invalid.

The remaining statutes cited by the City and the majority opinion as implied authori-

---

21. *Supra*, note 7.

22. *American Fork City v. Robinson, et al., supra,* note 10 at 77 Utah 171, 292 P. 250. *Accord, Bohn v. Salt Lake City, supra* note 8.

23. *Supra*, note 9.

24. *Id.* at 28 Utah 2d 346, 502 P.2d 559. *Accord, Allgood v. Larson,* Utah, 545 P.2d 530 (1976).

25. *Supra*, note 11.

**226**

ty for the City to enact the Ordinance are zoning statutes found in Title 10, Chapter 9, and §§ 57–5–3 and 57–5–4, the pertinent parts of which are cited in footnote 19 of this opinion. Clearly, these statutes do not grant the City *express* authority to enact the Ordinance nor do I find in these statutes implied authority to enact the Ordinance to carry out powers expressly granted under the zoning statutes. A generalized difference between zoning statutes and subdivision controls is that zoning normally prohibits certain uses of property, while the title remains in the private owner, and subdivision controls normally make positive exactions, such as conveyance of the title to the city, from the private owner.

. . . [I]t must be kept in mind that zoning regulations, generally, only limit the use of the property, whereas subdivision legislation often exacts a penalty for approval of a desired use.[26]

Traditionally, zoning and subdivision have been founded on separate legislation and administered separately. Subdivision regulation and zoning are frequently interrelated in purpose and technique; . . . [N]onetheless, fundamental differences do exist between the two areas. While zoning involves no more than negative prohibitions on certain uses of the owner's property, subdivision regulation often makes positive exactions of the owner. It may require him to construct streets or sewers, to convey a *portion of his land to the municipality for public use,* or to pay the equivalent of such construction or dedication in cash. It is submitted that this difference necessitates a more specific test of constitutionality, i. e., the legislation should not only be substantially related to the public health, safety, morals, or general welfare, but, insofar as dedications, activities and expenditures are positively required of the subdivider, these requirements should be reasonably related to the subdivision in question and should concern types of improvement for which municipalities have generally been conceded the power to levy special taxes or assessments.[27] [Emphasis added.]

Here, the City is not attempting to rezone the Subdividers' property from residential use to municipal use for schools and parks or to otherwise limit or prohibit its use. In this case, the City is requiring the Subdividers to *convey* land to it, or to pay it an amount of money equal to the value of the land, without remuneration. In no sense is this a conventional zoning case.

Further, §§ 57–5–3 and 57–5–4 cannot stand as authority for the Ordinance. The statutes automatically vest fee title in the municipal agency upon acknowledgment and recordation of the plat. They do not delegate to the cities and towns the power to enact ordinances exacting property or in lieu fees, without compensation, from private property owners as a condition to subdivision approval. Nor can such exaction be read as necessarily or even fairly implied from those sections.

In his review of State statutory authorizations for subdivision control, Yokley reviews §§ 57–5–1 to 57–5–8 of our Code and states:

A review of these provisions indicates an absence of any standards governing approval of plats except the usual directions for delineation of lots and streets, that is, there seems to be no authority conferred for the promulgation of regulations by the governing body which would require the meeting of certain conditions as a prerequisite to plat approval. The statute itself contains no provisions for meeting conditions before plat approval.[28]

Anderson, in *The American Law of Zoning,* distinguishes between requiring a subdivision developer to plan for streets and

---

**26.** *Noland v. St. Louis County,* Mo., 478 S.W.2d 363, 366 (1972).

**27.** Reps & Smith, Control of Urban Land Subdivision, 14 Syracuse L.Rev. 417, 407 (Spring 1963).

**28.** Yokley, The Law of Subdivisions, § 116 (1963). (Although this text is updated with a 1979 pocket part, Yokley had noted no new developments or changes to his stated position on Utah law in the 1963 text.)

sewers, which he states can be required with or without subdivision controls, and which may be required in this State under §§ 57–5–3 and 57–5–4, and exacting property for other municipal purposes, which he repeatedly states must be done pursuant to strictly construed enabling legislation.[29]

Finally, the Municipal Planning Enabling Act,[30] and specifically § 10–9–25, quoted by the majority opinion, cannot stand as sufficient authority for the City to take the Subdividers' property under its Ordinance. That Section states: "*In exercising the powers granted to it by the act* [the Municipal Planning Enabling Act], the planning commission shall prepare regulations governing the subdivision of land within the municipality." [Emphasis added.] Nowhere does the act authorize the planning commission or any municipality of this State to take any portion of a subdivider's property. The act enables municipal bodies to adopt a master plan (which the City has adopted), establish an official street map and to zone in conformance with those plans. It gives cities and towns the power to prohibit the issuance of a building permit or approval of a subdivision which does not conform to the master plan, and it makes it a misdemeanor to sell subdivision lots without planning commission approval. Again, in this case, the City is not attempting either to rezone the Subdividers' property or to refuse to approve their subdivision until it conforms to the master plan; the City, here, is appropriating the Subdividers' property.

The Legislature has had two opportunities to expressly expand the powers available to municipalities in controlling problems associated with rapid subdivision development, but it has not, as yet, prescribed that necessary expended power. In 1973, a bill was introduced in the Utah Senate which would have delegated to the cities the power to require fees or dedication of land or both as a condition for approval of a subdivision plat. In 1975, a bill amending

§ 10–9–25 was introduced in the Utah Senate which would have allowed cities and counties to prescribe qualifications upon subdividers, such as providing for storm drainage systems, parks and recreational facilities in order to gain approval of their subdivision plats. Neither bill gained the approval of both Houses of the Legislature.

I have reviewed those statutes characterized by the City and the majority opinion as enabling the City's actions here, and I remain unpersuaded that any or all of them are sufficient to expressly grant or necessarily imply to the City that power which it seeks to exercise by Ordinance No. 33. As noted *ante,* the normal presumptions in favor of the validity of *statutes* do not generally apply to ordinances, and this especially when the questioned ordinance seeks to appropriate to the government some protected private right.

There is some difference of view with respect to a presumption of power to enact an ordinance and also with respect to burden of proof on that issue. Generally, there is no such presumption of validity of an ordinance as against the objection that no power existed under charter or statute to enact it. In other words, there is no presumption in favor of the validity of an ordinance where it is questioned on the ground of want of power to enact it; on the contrary, power to pass it must appear to have existed when it was adopted, if the ordinance is to be sustained. Accordingly, one claiming under an ordinance must be able to point to existing power to enact it, either granted in express terms or in terms by which the power is fairly and necessarily implied. Also, proof of authority to enact an ordinance has been ruled to be necessary where . . . objection is made to it on the ground that it interferes with common rights. Indeed, the view has been taken that with respect to the exercise of every power by a municipal corporation, any reasonable doubt that arises as to the existence of the power is to be

**29.** 4 Anderson, The American Law of Zoning, § 23.39, p. 141 (1977); see generally §§ 23.05, 23.08, 23.26, and 23.39.

**30.** Sections 10–9–19 to 30.

resolved against the corporation, and the power is to be denied. Consistently, a strict construction against ordinances restricting personal liberty, property, immunity or privilege is followed in many cases. . . . Certainly, where it is clear that an ordinance exceeds the legislative powers of a city, it will not be presumed to be valid.[31]

Only after ordinances are satisfactorily determined to have been enacted pursuant to Legislative grants of authority may they carry the presumption of validity. In *Marshall v. Salt Lake City*,[32] Utah's zoning statutes were declared constitutional and the City's ordinances, *enacted pursuant to those express grants of authority,* were upheld. *At that point,* the presumption of validity attaches to the ordinance under attack and it will not be declared invalid unless it is arbitrary, discriminatory or unreasonable, or unless it clearly offends some provision of the Constitution or a statute.[33]

It is also only *after* a subdivision ordinance has been determined valid that it is to be tested as to its reasonableness in application to the particular fact situation. In *Jenad v. Village of Scarsdale*,[34] cited in the majority opinion, villages in the State of New York had been delegated sufficient grants of power to require exactions from subdividers, so the question became one of the reasonableness of the application of the ordinance to the facts of that case, unlike our problem here. Applying the presumption test to the facts of this case, the Ordinance should fail for want of authority to enact it.

Several states have enacted statutes authorizing mandatory dedication of land or in lieu fees as a prerequisite to plat approval. These enactments, however, have taken place *with a keen eye to protecting the rights of private property owners.* In *Asso-*

*ciated Home Builders v. City of Walnut Creek*,[35] a case relied upon by the City and the majority opinion, a dedication ordinance similar to the ordinance here survived attack. But *Associated Home Builders* does not stand for the proposition espoused by the majority opinion, because that case construed an ordinance which had been enacted pursuant to an express State enabling statute *and a newly adopted amendment to the California Constitution.* And in 1974, California passed statutes [36] requiring public agencies benefiting from the subdivision dedication *to remunerate* the developer-dedicator for his property.

The Subdividers also challenge the Ordinance as an unreasonable exercise of the police power because the City has deposited the in lieu fees into its general account, presumably to be used for general City purposes, and because they claim, the City has not shown that the exaction from them is reasonably related to the demands placed on the City by their subdivisions, and that therefore the exaction benefits others at their subdivision's expense. The affidavit of one of the Subdividers (made a part of the record) states, and the City does not dispute, that the Subdividers' in lieu fees have been used to purchase land for a water-detention basin to receive run-off from subdivisions *other than* the one developed by the Subdividers herein.

A reading of the Ordinance discloses that the land shall be dedicated or the in lieu fees paid "to the public use for the benefit and use of the citizens of the City of West Jordan" and "shall be used by the City for flood control and/or parks and recreational facilities."

As support for their argument, the Subdividers cite *Weber Basin Home Builders Ass'n v. Roy City*.[37] In that case, the Court

**31.** 6 McQuillin, *supra,* note 17, § 22.31.

**32.** 105 Utah 111, 141 P.2d 704 (1943).

**33.** *Id.;* see also *Gibbons & Reed Co. v. North Salt Lake City,* 19 Utah 2d 329, 431 P.2d 559 (1967).

**34.** 18 N.Y.2d 78, 271 N.Y.S.2d 955, 218 N.E.2d 673 (1966).

**35.** 4 Cal.3d 633, 94 Cal.Rptr. 630, 484 P.2d 606 (1971).

**36.** Cal.Govnt.Code § 66477–80 (West).

**37.** 26 Utah 2d 215, 487 P.2d 866 (1971).

struck as *ultra vires* and discriminatory a city ordinance raising building permit fees from $12 to $112. The money was received and paid into the city's general fund, as also occurred in this case, not for the purpose of meeting increased costs of regulating building construction, but for the purpose of improving the city's water and sewer systems necessitated by the construction of new homes and for other general purposes. The Court observed that equal protection and due process principles are violated by an ordinance which undertakes to impose a greater burden of general government cost on one class of residents than upon others without reasonable basis for classification and held that an ordinance which imposed a greater burden on those who built within the city after the ordinance than before its enactment was constitutionally unacceptable. Chief Justice Crockett, writing for the Court, correctly stated:

> The critical question here in whether the ordinance in its practical operation results in an unjust discrimination by imposing a greater burden of the cost of city government on one class of persons as compared to another, *without any proper basis for such differentiation and classification.* It is not to be doubted that each new residence has its effect in increasing the cost of city government; nor that due to the steadily increasing costs of everything, including those involved in rendering such services, the city would have authority to raise the fees charged for such services from time to time. Nevertheless, in that connection, the new residents are entitled to be treated equally and on the same basis as the old residents.[38] [Emphasis added.]

I am not unsympathetic to the needs of the cities in our State faced with dramatic expansion. I am constrained, however, to review their ordinances with sensitivity to both the constitutionally protected rights of property owners and the limiting nature of the statutory grants of power to those cities. And that sensitivity compels a view on my part that the Ordinance is invalid and void because of the specific reasons noted in this opinion.

MAUGHAN, J., concurs in the views expressed in the dissenting opinion of WILKINS, J.

---

**38.** *Id.* at 26 Utah 2d 218, 487 P.2d 868.