SALT LAKE COUNTY, a body corporate and politic of the State of Utah, Plaintiff and Appellee,

v.

The BOARD OF EDUCATION OF the GRANITE SCHOOL DISTRICT; Patricia Sandstrom, J. Dale Christensen, Gary Swensen, Lynn Davidson, and Judith A. Larson, as members of the Board of Education of the Granite School District; and John Reed Call, as the Superintendent of the Granite School District, Defendants and Appellants.

No. 880077.

Supreme Court of Utah.

March 18, 1991.

Kent S. Lewis, David E. Yocom, Salt Lake City, for Salt Lake County.

M. Byron Fisher, Jodi K. Feuerhelm, Salt Lake City, for Board of Educ.

HOWE, Associate Chief Justice:

The sole issue in this case is whether a drainage fee imposed by a Salt Lake County flood control ordinance is a "local assessment" within the meaning of Utah Code Ann. § 53–4–12 (1953) (now § 53A–3–408), which exempts school districts from paying "local assessments for any purpose."

In 1982, Salt Lake County enacted a flood control ordinance which created a "Flood Control Division" to "gather, control, and dispose of storm drainage and flood water" within the county. Salt Lake County, Utah, Code of Ordinances § 7–1–1 (1982). The ordinance provided that all property owners proposing to construct improvements must either contain the excess water from storms or floods generated by the construction or discharge the excess water into the County's drainage system.

The county is divided into drainage basins, which are subdivided into areas. If no county drainage system exists in a drainage area, a developer may permanently retain the storm water in his own facility and thereby exempt himself from payment of drainage fees. Ordinance at § 7–5–7(2); §§ 7–5–9 to –9.9. Alternatively, the developer may construct a temporary retention facility, pay the drainage fee, and wait for the County to construct the drainage system. §§ 7–5–8.6 to –8.9.

If the County has already constructed a drainage system for a particular drainage area, a developer is required to connect to it and pay the drainage fee. § 7–5–8.11. Fees are applied to the cost of drainage system construction within the drainage area and are assessed as a percentage of that cost. For example, if the runoff from a property will use 2 percent of the drainage capacity of the area system, the owner must pay a one-time fee of 2 percent of the construction cost. If the drainage system is not yet built, a projected cost is used to determine the fee. §§ 7–5–8 to –8.14.

Defendant Granite School District constructed three schools after the enactment of the ordinance. The drainage fee for each school was approximately $50,000. One school was constructed in a developed area where a drainage system was in place. Granite contributed to the construction of off-site drains, and this cost was credited to reduce the fee to $8,000. The ordinance required this school to be connected to the area system.

A second school was constructed in a less-developed area where a drainage system was designed but not in place. Gran-

ite chose to build a temporary water retention facility. The school will not be connected to the projected area drainage system unless and until adjacent properties are developed, "even if it takes 50 years." The fee assessed against the school would be invested in drainage pipes that would be laid "downstream" from the school property.

The third school was in an area where a drainage system was neither constructed nor designed. The fee assessed was based on the anticipated future cost of constructing a drainage system to accommodate run-off from the area when fully developed. Granite again chose not to opt out of the area system and instead built a temporary retention facility.

Granite failed to pay the assessed drainage fees, and the County brought this action in February 1987, seeking a declaratory judgment that Granite was not exempt from paying them. Granite filed a motion for summary judgment, contending that the drainage fee was a "local assessment" from which it was exempt under section 53–4–12, which provides:

> All property real and personal held by any board of education shall be exempt from general and special taxation, and from all local assessments for any purpose, and no such property shall be taken in any manner for debt.[1]

The County also moved for summary judgment, which the district court granted and from which Granite appeals.

The sole issue is whether the drainage fee is a local assessment under Utah Code Ann. § 53–4–12. In short, the County contends that the drainage fee is an "impact fee" and not a local assessment. Granite responds that it cannot be denied its statutory exemption by the "mere expedient of [the County's] manipulating the form of its funding for drainage improvements" and that regardless of the label placed on it, the purpose of the fee dictates that it is in essence a local assessment. We shall first determine whether, by definition, there are differences between local assessments and impact fees.

■ Impact fees are a species of real estate development exactions. "[D]evelopment exactions may be defined as contributions to a governmental entity imposed as a condition precedent to approving the developer's project. Usually, exactions are imposed prior to the issuance of a building permit or zoning/subdivision approval." Mazuran, *The Evolution of Real Estate Development Exactions in Utah*, 3 Utah Bar J. Aug./Sept. 1990, at 11. Development exactions "may take the form of: (1) mandatory dedications of land for roads, schools or parks, as a condition to plat approval, (2) fees-in-lieu of mandatory dedication, (3) water or sewage connection fees and (4) impact fees." Blaesser & Kentopp, *Impact Fees: The "Second Generation,"* 38 J.Urb. & Contemp.L. 55, 63 (1990) [hereinafter Blaesser & Kentopp].

Impact fees are generally defined as "charges levied by local governments against new development in order to generate revenue for capital funding necessitated by the new development." Juergensmeyer & Blake, *Impact Fees: An Answer to Local Governments' Capital Funding Dilemma*, 9 Fla.St.U.L.Rev. 415, 417 (1981); *Price Dev. Co. v. Redevelopment Agency*, 852 F.2d 1123, 1127 (9th Cir.1988); Comment, *Supporting Municipal Impact Fee Ordinances: A Kansas Perspective*, 37 Kan.L.Rev. 621, 621 n. 6 (1989). Blaesser and Kentopp provides some "key definitional elements" of impact fees which distinguish them "in one or more respects from taxes, special assessments and other types of exactions, such as fees-in-lieu of mandatory dedication, connection fees and user fees." Blaesser & Kentopp at 64. An impact fee is

* in the form of a predetermined money payment;
* assessed as a condition to the issuance of a building permit, an occupancy permit or plat approval;
* pursuant to local government powers to regulate new growth and develop-

---

**1.** Section 53–4–12 was repealed by 1988 Utah Laws chapter 2 and was replaced by a similar provision in section 62 thereof, which is now codified at Utah Code Ann. § 53A–3–408 (1989).

ment and provide for adequate public facilities and services;

\* levied to fund large-scale, off-site public facilities and services necessary to serve new development;

\* in an amount which is proportionate to the need for the public facilities generated by new development.

*Id.* This more detailed definition is of interest because the County's drainage fee satisfies all of its elements.

■ On the other hand, special or local assessments are imposed upon property within a limited area for the payment of a local improvement that is supposed to enhance the value of all property within that area. 70A Am.Jur.2d *Special or Local Assessments* § 1 (1987). See *Murray City v. Board of Education of Murray City School District,* 16 Utah 2d 115, 119, 396 P.2d 628, 630 (1964), for a similar definition. It has been said that the "primary difference" between impact fees and local assessments "is that special [or local] assessments represent a measure of the benefit of public improvements on new or existing development, whereas impact fees typically measure the cost of the demand or need for public facilities as a result of new development only." Blaesser & Kentopp at 67.

Two cases decided by this court early in this century illustrate the characteristics of local assessments. In those cases, local assessments had been imposed by Salt Lake City against the property of the city school district for street paving and for a public sewer. *State ex rel. Bd. of Educ. of Salt Lake City v. McGonagle,* 38 Utah 277, 112 P. 401 (1910); *Wey v. Salt Lake City,* 35 Utah 504, 101 P. 381 (1909). The assessments were payable in annual installments over a period of years and were a lien against the properties. This court struck down the assessments in both cases on the ground that under the predecessor statute to section 53–4–12, school district property was exempt from such assessments.

■ It is immediately apparent that a local or special assessment, which constitutes a lien against property, is different from an impact fee, which is not a lien but is imposed, as here, as a condition to the construction of improvements. We note Utah statutory authority for the creation of improvement districts in cities and towns, Utah Code Ann. §§ 10–16–1 to –40,[2] and in counties, Utah Code Ann. §§ 17–7–1 to –40.[3] In each instance, the assessment made against property in the improvement district constitutes a lien thereon, §§ 10–16–23, 17–7–23, and the property may be sold to pay any delinquent installment, §§ 10–16–24, 17–7–24. These improvement district assessments would seem to be local or special assessments. The legislature recognized that fact in each instance and, in order not to conflict with section 53–4–12, provided that no assessment could be levied against school district property. §§ 10–16–15, 17–7–15. School districts can, however, contract with the improvement district for the making of improvements. §§ 10–16–15, 17–7–15.

When the predecessor statute to section 53–4–12 was enacted in 1896 (known as Laws of Utah 1896, ch. CXXX, art. XV, § 149), legislation already existed authorizing the creation of districts within cities for purposes of installing street improvements and water, gas, and sewer pipes. Laws of Utah 1888, ch. XLVIII, art. XV. These improvements were financed by "local assessments" against the abutting property. It is very likely that these were the "local assessments" which the drafters of the 1896 legislation had in mind when they accorded school districts an exemption therefrom.

Despite the differences in definition and in characteristics, Granite relies on *McGonagle* for the proposition that the County cannot do by other means what it could not do directly by means of a local assessment. In *McGonagle,* the city argued that even though the special assessment it had imposed was invalid because the school property was exempt, the city,

---

**2.** Renumbered as §§ 17A–3–301 to –345 by 1990 Utah Laws ch. 186, §§ 831 to 874.

**3.** Renumbered as §§ 17A–3–201 to –243 by 1990 Utah Laws ch. 186, §§ 789 to 830.

as owner of the sewer, could impose a reasonable charge on the school district for permission to connect to or use the sewer and the amount of the assessment ($98) was a reasonable charge. The court rejected that argument, stating:

> Since the property was not subject to the assessment, and the levy for that reason invalid and the assessment unenforceable, to then permit the municipality to impose as a condition of tapping and making a connection with the public sewer the payment of a charge for the use of the sewer, is to allow the municipality, to do indirectly what it cannot do directly.

38 Utah at 280, 112 P. at 402 (citations omitted). This language does not aid Granite. What the *McGonagle* court stated was merely that when a city has decided to finance public improvements by means of local assessments and our statute exempts school districts from payment, an invalid assessment will not be disregarded because an equivalent amount might have been (but was not) imposed by other valid means. We do not have that situation in the instant case. The County is not urging us to indulge in any fiction; its thesis is that it has imposed an impact fee which is a distinct species from local assessments. In support of its thesis, the County points to prior cases in which we have recognized and dealt with mandatory land dedication, cash payments in lieu thereof, and sewer connection fees to be used for flood control, parks, and recreation facilities. *See Call v. City of West Jordan*, 606 P.2d 217 (Utah 1979), *reh'g*, 614 P.2d 1257 (1980); *Banberry Dev. Corp. v. South Jordan City*, 631 P.2d 899, 901 (Utah 1981); *cf.* Blaesser & Kentopp at 63 (four types of development exaction are mandatory dedication of land, fees in lieu thereof, connection fees, and impact fees). See also *Murray City v. Board of Education of Murray City*, 16 Utah 2d at 119, 396 P.2d at 630, where we distinguished a sewer connection fee and monthly service charges from local assessments.

Granite further contends that the purpose of the fee should determine whether it is a local assessment. If the purpose is to fund capital improvements which benefit the property, the fee should be regarded as a local assessment. This is the view adopted in California. *San Marcos Water Dist. v. San Marcos Unified School Dist.*, 42 Cal.3d 154, 720 P.2d 935, 940–41, 228 Cal.Rptr. 47, 52–53 (1986), and cases cited therein. The "purpose of the fee" test has the advantage of simplicity, but we decline to adopt it. "While it is true that special assessments are used to fund capital improvements, it does not follow that any charge used to fund capital improvements is necessarily a special assessment." *San Marcos Water Dist. v. San Marcos Unified School Dist.*, 171 Cal.App.3d 223, 217 Cal.Rptr. 260, 265 (1985), *rev'd on grounds of Cal. precedent*, 42 Cal.3d 154, 720 P.2d 935, 228 Cal.Rptr. 47 (1986).

Granite finally contends that even if an impact fee can be defined differently from a local assessment, we should deem them to be the same on public policy grounds. It argues that the statutory exemption for school districts arises from a public policy that taxing and assessing schools merely redistributes public funds from one tax-supported entity to another and that the drainage fee imposed here circumvents that policy. Florida, for example, statutorily exempts school boards from paying impact fees "to prevent money from needlessly passing from one public agency to another in the form of impact fees."[4]

We agree with Granite that its exemption from payment of local assessments should not be denied it by the simple expedient of calling a local assessment by another name. However, the legislature has recently had occasion to consider whether it deems impact fees to be local assessments. It has chosen not to broaden the language of the exemption section 53-4-12 to include impact fees and has, in fact, provided for the payment of impact fees by school districts in certain instances. The legislature in 1988, after this case arose, enacted section 53A-20-107, which provides:

---

4. Tamburello, *Statute Exempting Public Education Facilities from Impact Fees or Service Availability Fees Held Constitutional*, 16 Stetson L.Rev. 1115, 1117 (1987).

A school district is subject to the applicable local governmental entity's planning and zoning requirements under Section 11–16–1, except that a local governmental entity may not:

. . . .

(5) require a district to pay any impact fee for improvements not reasonably related to the impact of the project upon the need which the improvement is to' address. . . .

Thus the legislature has been made fully aware of the utilization of impact fees by local governments and has chosen to distinguish them from local assessments at least in the instances covered by section 53A–20–107. Because the legislature has spoken, setting public policy in this area, it is unnecessary for us to declare any.

We conclude that the flood control fee imposed by the County is an impact fee, not a local assessment under section 53–4–12.

The judgment below is affirmed.

HALL, C.J., and STEWART, DURHAM and ZIMMERMAN, JJ., concur.